UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

EVELYNE SUZANNE SUDRE, et al.,

Plaintiff,

v.

THE PORT OF SEATTLE, et al.,

Defendant.

CASE NO. C15-0928JLR

ORDER

## I.   INTRODUCTION

Before the court are five motions:  (1) Defendants The Port of Seattle ("the Port") and ABM Industries's ("ABM") (collectively, "Defendants") motion for summary judgment (MSJ (Dkt. # 31)); (2) Defendants' motion for relief from the court's case scheduling order and for leave to amend their answers (MTA (Dkt. # 46)); (3) Defendants' motion to exclude the testimony of Plaintiffs Evelyne Suzanne Sudre and Michel Sudre's (collectively, "Plaintiffs") expert witness William Martin (Pls.' MTE

ORDER- 1

(Dkt. # 33)); (4) Plaintiffs' motion to exclude portions of the testimony of Defendants' expert witness Alan Black (Defs.' MTE (Dkt. # 35)); and (5) Plaintiffs' motion for sanctions against Defendants for spoliation of evidence (MFS (Dkt. # 36)).  The court has considered the motions, the parties' responses, the parties' replies, the relevant portions of the record, and the applicable law.  Being fully advised,[1] the court DENIES Defendants' motion for summary judgment; GRANTS Defendants' motion for relief from the court's case scheduling order and for leave to amend their answers subject to further instruction as set forth below; GRANTS in part and DENIES in part Defendants' motion to exclude the testimony of William Martin; GRANTS Plaintiffs' motion to exclude portions of the testimony of Alan Black; and DENIES Plaintiffs' motion for sanctions for spoliation of evidence.

## II.    BACKGROUND

### A.    The Complaint

This case arises from Ms. Sudre's alleged slip and fall at SeaTac International Airport ("STIA") on September 22, 2014.  (*See* Compl. (Dkt. # 1) ¶ 3.1.)  The Port operates STIA (*id.* ¶ 1.3; *see also* Port Answer (Dkt. # 12) ¶ 1.3), and ABM is a contractor for the Port and provides janitorial services at STIA (Compl. ¶ 1.4; *see also* ABM Answer (Dkt. # 11) ¶ 1.4; MSJ at 2.)  Ms. Sudre was traveling with her husband, Michel Sudre, and her sister on their way back to France from a vacation in the United

---

[1] Neither party requested oral argument on any of the motions, and the court determines that oral argument would not be helpful to its disposition of the motions.  *See* Local Rules W.D. Wash. LCR 7(b)(4) ("Unless otherwise ordered by the court, all motions will be decided by the court without oral argument.").

States.  (Compl. ¶ 3.1.)  Ms. Sudre alleges that as she headed "for the departure gate for her flight to Paris, France, she slipped and fell on the wet and slippery floor of the departure lounge." (*Id.* ¶ 3.2.)  She alleges that "[t]he floor was wet and in a dangerous state" (*id.* ¶ 3.3), and contends that at the time of her fall, "the floor was being cleaned by employees of defendant ABM" and "[w]holly inadequate warnings were given as to the dangerous condition of the floor" (*id.* ¶ 3.4).  As a result of the fall, Ms. Sudre "suffered a serious fracture to the neck of her right femur" and "was hospitalized upon returning to France" where she "underwent surgery." (*Id.* ¶ 3.5.)  Ms. Sudre alleges that she "has been permanently damaged" by the fall. (*Id.*)  Ms. Sudre asserts that she was not contributorily negligent because she "exercised all due care at all times." (*Id.* ¶ 3.7.)  Ms. Sudre further alleges that Defendants "were on notice, both actual and constructive, of the dangerous condition but did nothing to remedy it." (*Id.* ¶ 3.8.)

Ms. Sudre brings one claim of negligence against Defendants for her fall. (*Id.* ¶¶ 4.1-4.4.)  Ms. Sudre claims damages for her injuries, as well as for "emotional upset, distress and hurt, financial and medical expenses, and . . . a loss of earnings." (*Id.* ¶ 4.2.)  Ms. Sudre alleges that "the accident has severely impacted her ability to walk and practice sport." (*Id.* ¶ 4.3.)  Mr. Sudre asserts loss of consortium due to Ms. Sudre's injury. (*Id.* ¶ 4.5.)

**B.     The Events Surrounding Ms. Sudre's Fall**

On their motion for summary judgment, Defendants contend that the evidence in this case establishes three possible locations where Ms. Sudre fell based on Ms. Sudre's testimony, Mr. Sudre's testimony, and STIA and ABM employees' testimony, and

therefore three possible versions of events.  (*See* MSJ at 2 (illustrating three possible

locations of Ms. Sudre's fall).)  In response, Plaintiffs point to additional facts

surrounding Ms. Sudre's fall.[2]  (*See* MSJ Resp. (Dkt. # 67) at 5-8.)

    1.  Ms. Sudre's Version of Events

    Under Ms. Sudre's version of events, Ms. Sudre stepped onto a moving walkway

at STIA's Concourse A and saw a yellow cone when she came to the end of the walkway.

(Northcraft Decl. ISO MSJ (Dkt. # 32) ¶ 1, pp. 3-23 ("E. Sudre Dep.") at 7:14-20, 8:2-6.)

Ms. Sudre testified that the yellow cone was about one meter tall, to the right of the

moving walkway, and about 10 meters from the end of the walkway.  (*Id.* at 8:7-13,

9:1-13.)  Ms. Sudre then testified that she exited the moving walkway, walked about 10

meters and then began to walk around the cone on the right side.  (*Id.* at 10:18-11:19.)

She testified that she walked about 10 meters past the cone and that once it was about

five or six meters behind her, she slipped and fell.  (*Id.* at 13:12-14:19.)  Ms. Sudre

estimates that she fell about 10 meters from the cone.  (*Id.* at 13:14-20.)

    Ms. Sudre further testified that she did not see any water or moisture on the floor

when she fell, but that a maintenance worker wiped off Ms. Sudre's shoes.  (*Id.* at

13:5-11, 21:14-19, 15:15-17, 16:13-23.)  Ms. Sudre believed the soles of her shoes must

have been wet because the maintenance worker wiped them off, but she did not see for

herself whether the soles were wet.  (*Id.* at 17:5-9, 21:20-24, 22:13-17.)  Ms. Sudre saw

the paper that the maintenance worker used to wipe her soles (*id.* at 16:24-18:9), and

---

[2] Plaintiffs also challenge ABM employee Hector Aguilar's version of events based on
his deposition corrections, which the court discusses *infra* § III.A.3.

stated that "the paper towel was wet" (*id.* at 18:12-16; *see also* Capp Decl. in. Opp. to

MSJ (Dkt. # 69) ¶ 3 (citing E. Sudre. Dep. at 34:16-18 ("I did see that the paper that he

had in his hand was humid, so when he wiped my shoes there was something."),

141:16-17 ("[T]he man who came to wipe my shoes, I could see that the towel in his

hand got wet."))).)

    2.  <u>Mr. Sudre's Version of Events</u>

    Mr. Sudre testified that Ms. Sudre exited the moving walkway, walked about three

to four meters to the right of the cone, and fell.  (Northcraft Decl. ISO MSJ ¶ 2, pp. 24-45

("M. Sudre Dep.") at 30:13-21.)  He testified that when she fell, Ms. Sudre was even with

the cone or slightly ahead of it.  (*Id.* at 44:25-45:4.)  He also testified that when Ms.

Sudre fell, he noticed moisture on the floor.  (*Id.* at 32:15-20, 33:12-19, 37:23-38:15,

38:20-39:3.)  Mr. Sudre further testified that the moisture "was comparable to when

moisture has just been cleaned up with either a mop or rag." (*Id.* at 34:23-35:3.)  Mr.

Sudre stated that he did not "see any puddles, any spills, or any droplets."  (MSJ at 5

(citing M. Sudre Dep. at 35:9-13).)  Mr. Sudre also testified that someone wiped off the

soles of Ms. Sudre's shoes and that he did not see the soles of her shoes.  (M. Sudre Dep.

at 40:19-41:3, 42:20-23.)

    Mr. Sudre also testified that he observed that the wet area where Ms. Sudre fell

was approximately one meter by one meter.  (MSJ Resp. at 5; M. Sudre Dep. at 31:19-23,

32:17-19 (The area was "wet around my wife, around her shoes."); M. Sudre. Decl. (Dkt.

# 38) ¶¶ 11-12.)  Mr. Sudre also stated that the janitorial employee who wiped Ms.

*//*

1    Sudre's shoes after her fall said "sorry, sorry, sorry" as he did so.  (MSJ Resp. at 5, 11,

2    12; M. Sudre Dep. at 37:5-11; Sudre Decl. ¶¶ 14-15.)

3             3.  <u>Defendants' Version of Events</u>

4             At the time of Ms. Sudre's fall, ABM's janitorial employee Hector Aguilar

5    patrolled and cleaned the concourse areas as part of his duties.  (Northcraft Decl. ISO

6    MSJ ¶ 4, pp.62-70 ("Aguilar Dep.") at 66.)   Shortly before Ms. Sudre's fall, Mr. Aguilar

7    had found a spill in Concourse A, which he testified looked like a mocha or chocolate

8    coffee.  (*Id.* at 68.)  Mr. Aguilar testified that the spill was small (*id.*), and that "[h]e

9    cleaned it up the same way he normally cleaned spills" (MSJ at 6 (citing Aguilar Dep. at

10   68)).  Mr. Aguilar put his cart by the spill, mopped the liquid, placed a sign over the spill,

11   and waited by the sign for the area to dry.  (Aguilar Dep. at 68-69.)  Mr. Aguilar testified

12   that he recalled seeing Ms. Sudre while she was on the moving walkway, but did not

13   notice her again until after her fall.  (*Id.* at 69.)  He further testified that he thought Ms.

14   Sudre kicked the wet floor sign when she fell because the sign moved from where he had

15   placed it and he had to put it back in place after her fall.  (*Id.*)

16            After Mr. Aguilar had cleaned the spill but before Ms. Sudre fell, Port of Seattle

17   employee Patrick Lisk was speaking with Mr. Aguilar at the site of the spill Mr. Aguilar

18   had cleaned.  (Aguilar Dep. at 69; Northcraft Decl. ISO MSJ ¶ 3, pp. 46-61 ("Lisk Dep.")

19   at 48:4-49:5.)  Mr. Lisk testified that he saw Mr. Aguilar standing with his cart, but did

20   not know that Mr. Aguilar had just cleaned up a spill and did not see the wet floor sign

21   because the cart obscured it.  (Lisk Dep. at 49:20-22, 48:21-49:5, 49:12-19, 50:12-22.)

22   Mr. Lisk states that he noticed Ms. Sudre on the moving walkway, but did not see her

1    again until after she fell.  (*Id.* at 55:22-56:13, 57:25-58:3.)  Mr. Lisk testified that Ms.

2    Sudre landed within three to four feet of him when she fell.  (*Id.* at 51:15-21.)  Mr. Lisk

3    further testified that he did not see how Mr. Aguilar responded to Ms. Sudre's fall and did

4    not see whether the wet floor sign was kicked across the floor.  (*Id.* at 54:11-20,

5    60:22-61:10.)

6                            **III.    ANALYSIS**

7    **A.    Evidentiary Challenges**

8           As an initial matter, the parties argue that the court should strike several pieces of

9    evidence in support of their respective motions.  Specifically, Plaintiffs argue that (1)

10   Defendants' counsel's declarations in support of their motions are not made on personal

11   knowledge; (2) the deposition excerpts Defendants submitted have not been properly

12   authenticated; and (3) Mr. Aguilar lacked personal knowledge for his deposition

13   corrections and made corrections that constitute sham testimony.[3]  (MSJ Resp. at 2-3;

14   MFS Reply (Dkt. # 65) at 5; Defs.' MTE Resp. (Dkt. # 60) at 2.)  For their part,

15   Defendants argue that the court should strike (1) the "sorry" statement that a purported

16   employee of Defendants made when he wiped off Ms. Sudre's shoes as inadmissible

17   hearsay, and (2) Mr. Sudre's testimony that "it looked like [the floor] had just been

18   cleaned up in a bathroom with a rag/mop" as inadmissible lay testimony.  (MSJ Reply

19   (Dkt. # 71) at 6, 9.)  The court addresses each of these evidentiary objections in turn.

20   //

21   _____

22   [3] The court addresses Plaintiffs' assertions that Defendants' medical expert Christopher
     Boone's second and third declarations constitute sham testimony *infra* § III.C.2.b.

1        1.  Mr. Northcraft's and Ms. Markette's Declarations

2        "An attorney may submit a declaration as evidence to a motion for summary

3   judgment."  *Clark v. Cty. of Tulare*, 755 F. Supp. 2d 1075, 1083 (E.D. Cal. 2010).

4   "Federal Rule of Civil Procedure 56(e) requires that affidavits [and declarations]

5   submitted in support of a motion for summary judgment . . . (1) be made on the personal

6   knowledge of an affiant who is competent to testify to the matters stated therein, [and]

7   (2) . . . state facts that would be admissible in evidence . . . ."  *Boyd v. City of Oakland*,

8   458 F. Supp. 2d 1015, 1023 (N.D. Cal. 2006).  Although "[a] declarant's mere assertions

9   that he or she possesses personal knowledge and competency to testify are not sufficient,"

10  *id.*, "[p]ersonal knowledge may be inferred from the affiant's position," *Bellah v. Am.*

11  *Airlines Inc.*, 623 F. Supp. 2d 1183, 1186 (E.D. Cal. 2009).  "Declarations by attorneys

12  are sufficient only if the facts stated are matters of which the attorney has knowledge,

13  such as matters occurring during the course of the lawsuit, [like the] authenticity of a

14  deposition transcript."  *Tulare*, 755 F. Supp. 2d at 1084.

15        In their declarations, Mr. Northcraft and Ms. Markette state that they are attorneys

16  for Defendants and are "familiar" with this lawsuit.  (*See* Northcraft Decl. ISO MSJ at 1;

17  Northcraft Decl. in Opp. to MFS (Dkt. # 59) at 1; Markette Decl. ISO MTA (Dkt. # 47) at

18  1; Markette Decl. ISO Defs.' MTE (Dkt. # 57) at 1.)  In addition, Mr. Northcraft and Ms.

19  Martkette testify in their declarations to matters related to this litigation—the authenticity

20  of deposition excerpts (Northcraft Decl. ISO MSJ ¶¶ 1-4), the authenticity of the parties'

21  written discovery responses (Northcraft Decl. in Opp. to MFS at 1-2), and the timeline of

22  the parties' discovery, various communications between counsel, and the

1    supplementation of Defendants' expert's reports (Markette Decl. ISO MTA at 2-5;

2    Markette Decl. ISO Defs.' MTE ¶¶ 1-8).  Here, Mr. Northcraft's and Ms. Markette's

3    personal knowledge "may be inferred from [their] position[s]" as Defendants' attorneys

4    in this matter. *Bellah*, 623 F. Supp. 2d at 1186; *see also Tulare*, 755 F. Supp. 2d at 1084.

5    Accordingly, the court concludes that Mr. Northcraft and Ms. Markette have personal

6    knowledge of the matters to which they attest in their declarations.

7         2.  <u>Deposition Excerpts</u>

8         "A deposition or an extract therefrom is authenticated in a motion for summary

9    judgment when it identifies the names of the deponent and the action and includes the

10   reporter's certification that the deposition is a true record of the testimony of the

11   deponent." *Orr v. Bank of Am., NT& SA*, 285 F.3d 764, 774 (9th Cir. 2002); *see also*

12   *Boyd*, 458 F. Supp. 2d at 1023 ("[I]f the affidavit refers to any document or item, a sworn

13   or certified copy of that document or item must be attached to the affidavit.").  Plaintiffs

14   argue that none of the deposition excerpts that Defendants provided the court in

15   connection with their motion for summary judgment "are accompanied by the court

16   reporter's certification and are thus inadmissible." (MSJ Resp. at 2.)  Defendants agree

17   that they should have filed certification pages with their deposition excerpts and

18   subsequently filed the proper certification pages with Defendants' reply brief.  (MSJ

19   Reply at 9; *see also* Northcraft Decl. ISO MSJ Reply (Dkt. # 72) ¶¶ 1-4.)  Accordingly,

20   the court declines to strike the deposition excerpts because they have now been properly

21   authenticated. *See Orr*, 285 F.3d at 774.

22   //

1    3. <u>Mr. Aguilar's Deposition Corrections</u>

2    A person may make corrections to his deposition testimony "30 days after being

3 notified by the officer the [deposition] transcript . . . is available."  Fed. R. Civ. P.

4 30(e)(1).  "[I]f there are changes in form or substance," the deponent must "sign a

5 statement listing the changes and the reasons for making them."  Fed. R. Civ. P.

6 30(e)(1)(B).

7    Under Ninth Circuit law, a party cannot create an issue of fact by correcting his

8 prior deposition testimony.  *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th

9 Cir. 2009); *Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1225

10 (9th Cir. 2005) (holding that deposition corrections under Federal Rule of Evidence 30(e)

11 cannot be used to create an issue of fact by contradicting prior deposition testimony).

12 This sham deposition correction rule is applied sparingly, however, "because it is in

13 tension with the principle that the court is not to make credibility determinations when

14 granting or denying summary judgment."  *Yeager v. Bowlin*, 693 F. 3d 1076, 1080 (9th

15 Cir. 2012).  The court must make a finding of fact that a contradiction is actually a sham,

16 and any inconsistency between the deposition testimony and the subsequent corrections

17 "must be clear and unambiguous to justify striking" the corrections.  *Van Asdale*, 577

18 F.3d at 998-99.  Although "a district court may find a declaration to be a sham when it

19 contains facts that the affiant previously testified he could not remember," the Ninth

20 Circuit "caution[s] that newly-remembered facts, or new facts, accompanied by a

21 reasonable explanation, should not ordinarily lead to the striking of a declaration [or

22 deposition correction] as a sham."  *Yeager*, 693 F.3d at 1080-81.  "When determining

1  whether deposition corrections are a 'sham' or otherwise intended to create an issue of

2  fact for summary judgment, the timing of the deposition changes is informative." *Updike*

3  *v. Clackamas Cty.*, No. 3:15-cv-00723-SI, 2016 WL 680536, at *1 (D. Or. Feb. 19, 2016)

4  (citing *Hambleton*, 397 F.3d at 1225, in which the Ninth Circuit noted that deposition

5  corrections made after a pending motion for summary judgment were "seemingly

6  tactical").

7        Mr. Aguilar made several corrections to his deposition testimony, many of which

8  clarify or correct his earlier testimony.  (*See* Aguilar Dep. at 66-70.)  Some of Mr.

9  Aguilar's corrections, however, provide facts that Mr. Aguilar stated he could not

10  remember during his deposition.  (*See id.* at 68-69.)  Of particular note, Mr. Aguilar

11  testified during his deposition that he could not remember Ms. Sudre's fall (*see id.* at

12  38:1-39:10, 40:16-43:8), but his corrected testimony states that he remembers her fall and

13  provides additional details about the fall (*id.* at 68-69).  Despite this inconsistency, the

14  court finds that Mr. Aguilar provides reasonable explanations for the "newly remembered

15  facts."  *See Yeager*, 693 F.3d at 1081; *see also id.* at 1080 (holding declaration was a

16  sham where the plaintiff "provided no reason for his sudden ability to recall specific

17  facts").

18        Mr. Aguilar explains that he did not understand and was confused about what the

19  attorney conducting the deposition asked him (*id.* at 66-69) and that there were

20  interpretation or transcription mistakes (*id.* at 68).  These explanations appear reasonable,

21  particularly given that Mr. Aguilar is 72 and relied on an interpreter during his

22  deposition.  (*See id.* at 7:9, 10-13.)  In addition, the deposition transcript reveals

ORDER- 11

1   confusion at times between Mr. Aguilar, the attorney conducting the deposition, and the

2   interpreter.  (*See, e.g.*, Aguilar Dep. at 8:2-5, 10:19-11, 12:4-6, 14:14-18; MSJ Resp. at

3   4.)  Further, Mr. Aguilar corrected his transcript on May 18, 2016, shortly after his April

4   7, 2016, deposition[4] (*see* Aguilar Dep. at 66), which casts doubt on Plaintiffs' contention

5   that Mr. Aguilar corrected his testimony solely to create a dispute of fact for summary

6   judgment (*see* MSJ Resp. at 4-5; MSJ (filed on October 11, 2016)); *Updike*, 2016 WL

7   680536, at *1.  The court, therefore, will not strike Mr. Aguilar's deposition corrections.

8   However, Mr. Aguilar's testimony as a whole consists of "the original deposition

9   transcript as supplemented" by the corrections, and Plaintiffs may show any factfinder for

10   impeachment or other proper purposes that Mr. Aguilar made these additions after Mr.

11   Aguilar's deposition had concluded.  *See Updike*, 2016 WL 680536, at *2.

12          Further, the court may infer personal knowledge from Mr. Aguilar's position.  *See*

13   *Bellah*, 623 F. Supp. 2d at 1186.  Given Mr. Aguilar's employment with ABM and work

14   at STIA, including that he worked as a janitor in Concourse A at the time of Ms. Sudre's

15   fall (Aguilar Dep. at 7:17-19, 66), the court concludes that Mr. Aguilar's deposition

16   corrections were made on personal knowledge.

17          4.   The "Sorry" Statement

18          Federal Rule of Evidence 401 states that "[e]vidence is relevant if . . . it has any

19   tendency to make a fact more or less probable than it would be without the evidence" and

20   _____

21          [4] A person may make corrections to his deposition transcript "30 days after being notified
     by the officer the [deposition] transcript . . . is available."  Fed. R. Civ. P. 30(e)(1).  Here, there is

22   no indication that Mr. Aguilar made his corrections more than 30 days after the officer notified
     him that the transcript was available.  (*See* MSJ Resp.)

1    "the fact is of consequence in determining the action."  Fed. R. Evid. 401(a)-(b).  Hearsay

2    is an out-of-court statement that "a party offers into evidence to prove the truth of the

3    matter asserted in the statement," Fed. R. Evid. 801(c), and is generally inadmissible, *see*

4    Fed. R. Evid. 802.  Under Rule 801(d)(2)(D), hearsay evidence is nevertheless admissible

5    if "[t]he statement is offered against an opposing party" and "was made by the party's

6    agent or employee on a matter within the scope of that relationship and while it existed."

7    Fed. R. Evid. 801(d)(2)(D).

8         Defendants argue that the apology Plaintiffs contend Mr. Aguilar made after Ms.

9    Sudre's fall is not relevant under Federal Rule of Evidence 401 because the "statement

10   can easily have more than one meaning."  (MSJ Reply at 10); Fed. R. Evid. 401.

11   Defendants also argue that the statement is hearsay because Plaintiffs "appear to be

12   offering [it] as evidence" that the person who said it "was somehow asserting fault."

13   (MSJ Reply at 9-10).  They contend that "[a]ssuming the 'sorry' statement was actually

14   made, the person saying 'sorry' undoubtedly intended to assert something thereby."  (*Id.*

15   at 10.)  Defendants also contend that "the person saying 'sorry' cannot be identified as

16   the Defendants' agent or employee."  (*Id.*); *see also* Fed. R. Evid. 801(d)(2)(D) (stating

17   exception to the rule against hearsay for statements made by a party's agent).

18        The court declines to rule on the admissibility of the statement at this time.  The

19   court does not have sufficient context about who made the statement to determine

20   whether it is relevant or whether the statement is admissible under Federal Rule of

21   Evidence 801(d)(2)(D) if the statement indeed constitutes hearsay.  The court will

22   therefore address the admissibility of the statement in ruling on the parties' motions in

1    limine.  (*See* Defs.' MIL (Dkt. # 74) at 7-8 (seeking to exclude this statement from the

2    evidence offered at trial.)

3        5.  Mr. Sudre's Testimony

4         "[T]estimony in the form of an opinion is limited to one that is:  (a) rationally

5    based on the witness's perception; (b) helpful to clearly understanding the witness's

6    testimony or to determining a fact in issue; and (c) not based on scientific, technical, or

7    other specialized knowledge within the scope of [Federal Rule of Evidence] 702."  Fed.

8    R. Evid. 701.  "In presenting lay opinions, the personal knowledge requirement may be

9    met if the witness can demonstrate firsthand knowledge or observation."  *United States v.*

10   *Lopez*, 762 F.3d 852, 864 (9th Cir. 2014).  An opinion is rationally based on the witness's

11   perception when "the opinion is one that a normal person would form on the basis of the

12   observed facts."  *Cal. Found. for Indep. Living Ctrs. v. Cty. of Sacramento*, 142 F. Supp.

13   3d 1035, 1045 (E.D. Cal. 2015); *see also United States v. Beck*, 418 F.3d 1008, 1015 (9th

14   Cir. 2015) ("We hold that a lay witness's testimony is rationally based within the

15   meaning of Rule 701 where it is based upon personal observation and recollection of

16   concrete facts." (internal quotation marks omitted)).  "Courts have found lay witness

17   testimony unhelpful and thus inadmissible if it is mere speculation, an opinion of law, or

18   if it usurps the jury's function."  *Cal. Found. for Indep. Living Ctrs.*, 142 F. Supp. 3d at

19   1045.  "The admission of lay opinion testimony is 'within the broad discretion of the trial

20   judge [and] not to be disturbed unless it is manifestly erroneous.'"  *United States v.*

21   *Simas*, 937 F.2d 459, 464 (9th Cir. 1991) (quoting *United States v. Fleishman*, 684 F.2d

22   1329, 1335 (9th Cir. 1982)) (alteration in original).

1      Mr. Sudre's testimony that the moisture on the floor looked to him like "it had just

2   been cleaned up in a bathroom with a rag/mop" (MSJ Reply at 6) is admissible because

3   his opinion "is rationally based on [his] perception" at the time Ms. Sudre fell, Fed. R.

4   Evid. 701.[5]  His testimony as to what the floor looked like is not mere speculation as

5   Defendants contend.  (MSJ Reply at 6 ("Although Mr. Sudre can testify as to what [the

6   moisture he observed] looked like," he cannot conclude "that it looked like it had just

7   been cleaned up in a bathroom with a rag/mop.").)  Rather, it amounts to "an opinion that

8   a normal person would form on the basis of the observed facts." *Cal. Found. for Indep.*

9   *Living Ctrs.*, 142 F. Supp. 3d at 1045.  Mr. Sudre simply testified regarding the

10  appearance of the floor and the moisture on it when he knelt to assist Ms. Sudre.

11  Accordingly, Mr. Sudre's testimony is based on his observation and recollection of the

12  facts surrounding Ms. Sudre's fall. *See Beck*, 418 F.3d at 1015.  In addition, this

13  testimony is "helpful to determining" whether an unsafe condition existed and caused

14  Ms. Sudre to fall and is not based on scientific, technical, or other specialized knowledge.

15  *See* Fed. R. Evid. 701.

16  **B.     Motion for Summary Judgment**

17         1.  <u>Legal Standard</u>

18         Summary judgment is appropriate if the evidence shows "that there is no genuine

19  dispute as to any material fact and the movant is entitled to judgment as a matter of law."

20

21         [5] The court notes that Defendants rely on Mr. Sudre's testimony in their motion for
22  summary judgment.  (MSJ at 5 (Mr. Sudre "said the humidity was comparable to when moisture
    has just been cleaned up with either a mop or rag." (citing M. Sudre Dep. at 34:23-35:3)).)

1    Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

2    *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

3    outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

4    factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

5    finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

6    992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

7           The moving party bears the initial burden of showing there is no genuine dispute

8    of material fact and that the movant is entitled to prevail as a matter of law.  *Celotex*, 477

9    U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial,

10   it can show the absence of a dispute of material fact in two ways:  (1) by producing

11   evidence negating an essential element of the nonmoving party's case, or (2) by showing

12   that the nonmoving party lacks evidence of an essential element of its claim or defense.

13   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If the

14   moving party will bear the ultimate burden of persuasion at trial, it must establish a prima

15   facie showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal*

16   *Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must

17   present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.

18   *Id*. at 1473.  If the moving party meets its burden of production, the burden then shifts to

19   the nonmoving party to identify specific facts from which a fact finder could reasonably

20   find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at

21   252.

22   *//*

ORDER- 16

1    The court is "required to view the facts and draw reasonable inferences in the light

2  most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

3  The court may not weigh evidence or make credibility determinations in analyzing a

4  motion for summary judgment because these responsibilities are "jury functions, not

5  those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party

6  "must do more than simply show that there is some metaphysical doubt as to the material

7  facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find

8  for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380

9  (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio

10  Corp.*, 475 U.S. 574, 586-87 (1986)). Accordingly, "mere allegation and speculation do

11  not create a factual dispute for purposes of summary judgment," *Nelson v. Pima Cmty.

12  Coll.*, 83 F.3d 1075, 1081-81 (9th Cir. 1996), and "[a] trial court can only consider

13  admissible evidence in ruling on a motion for summary judgment," *Orr*, 285 F.3d at 773.

14        2.  Motion for Summary Judgment

15              a.  *Negligence by a Possessor of Land on a Premises Liability Theory*

16    Defendants assert that Plaintiffs have insufficient evidence to prove their claim of

17  negligence on a premises liability theory. (MSJ at 11-13; *see also generally* Compl.

18  (asserting claim of negligence on a premises liability theory).) A cause of action for

19  negligence under Washington law requires the plaintiff to establish "(1) the existence of a

20  duty owed, (2) breach of that duty, (3) a resulting injury, and (4) a proximate cause

21  between the breach and the injury." *Pedroza*, 677 P.2d at 168. According to premises

22  liability theory, a landowner or possessor of land owes an individual a duty of care based

1   on the individual's status—invitee, licensee, or trespasser—upon the land. *Curtis v. Lein*,

2   239 P.3d 1078, 1081 (Wash. 2010). "The threshold determination of whether a duty

3   exists is a question of law." *Degel v. Majestic Mobile Manor, Inc.*, 914 P.2d 728, 731

4   (Wash. 1996). The parties do not dispute that Ms. Sudre was the Port's business invitee

5   at the time of her fall. (*See* MSJ at 9 ("At the time of her injury, [Ms.] Sudre was a

6   business invitee, as her presence at STIA was directly connected to the Port's business

7   dealings at STIA.").)

8        Washington has adopted Sections 343 and 343A of the *Restatement (Second) of*

9   *Torts* to define a possessor of land's duty to invitees. *Kamla v. Space Needle Corp.*, 52

10  P.3d 472, 477 (Wash. 2002). The *Restatement* provides that a possessor of land is subject

11  to liability for physical harm caused to his invitees by a condition on the land only if the

12  possessor "(a) knows or by the exercise of reasonable care would discover the condition,

13  and should realize that it involves an unreasonable risk of harm to such invitees, and (b)

14  should expect that they will not discover or realize the danger, or will fail to protect

15  themselves against it, and (c) fails to exercise reasonable care to protect them against the

16  danger." *Id.* (quoting *Restatement (Second) of Torts* § 343). Additionally, "a possessor

17  of land is not liable to his or her invitees for physical harm caused to them by any activity

18  or condition on the land whose danger is known or obvious to [the invitees], unless the

19  possessor should anticipate the harm despite such knowledge or obviousness." *Id.*

20  (quoting *Restatement (Second) of Torts* § 343A (emphasis and brackets omitted)). "The

21  comment to the *Restatement* explains that such anticipation may be found 'where the

22  possessor has reason to expect that the invitee will proceed to encounter the known or

1    obvious danger because to a reasonable [person] in [that] position the advantages of

2    doing so would outweigh the apparent risk.'" *Iwai v. State*, 915 P.2d 1089, 1093-94

3    (Wash. 1996) (quoting *Degel*, 914 P.2d at 731-32).

4          For a defendant to be liable to an invitee, the plaintiff must demonstrate that the

5    landowner caused the unsafe condition or that "the landowner had actual or constructive

6    knowledge of the unsafe condition."[6] *Iwai*, 915 P.2d at 1094, 1097.  "Constructive notice

7    arises where the condition 'has existed for such time as would have afforded [the

8    possessor] sufficient opportunity, in the exercise of ordinary care, to have made a proper

9    inspection of the premises and to have removed the danger.'" *Ingersoll v. DeBartolo,*

10   *Inc.*, 869 P.2d 1014, 1015 (Wash. 1994) (quoting *Smith v. Manning's, Inc.*, 126 P.2d 44,

11   47 (Wash. 1942)); *see also Carlyle v. Safeway Stores, Inc.*, 896 P.2d 750, 752 (Wash. Ct.

12   App. 1995).  "The notice requirement insures liability attaches only to owners once they

13   become or should have become aware of a dangerous situation." *Iwai*, 915 P.2d at 1095.

14         A possessor of land may be liable for the acts of its contractors that create unsafe

15   conditions on the possessor's premises.[7] *See G.W. Blancher v. Bank of Cal.*, 286 P.2d

16   92, 94 (Wash. 1955); *Gildon v. Simon Prop. Grp., Inc.*, 145 P.3d 1196, 1203 (Wash.

17   2006) ("Liability is imposed on the possessor of land and one acting on behalf of the

18

19       [6] Washington recognizes "two exceptions to the notice requirement in premises liability cases." *Iwai*, 915 P.2d at 1095.  "Under the first exception, if a specific unsafe condition is foreseeably inherent in the nature of the business or mode of operation, plaintiffs need not prove

20   notice for liability to be imposed." *Id.* (internal quotations omitted).  "A second exception to the notice requirement also might apply . . . [i]f the landowner caused the hazardous condition . . . ."

21   *Id.* at 1097.  Plaintiffs rely on the second exception in their response to the motion for summary judgment.  (MSJ Resp. at 10-11.)

22       [7] Defendants do not raise this issue.  (*See generally* MSJ; MSJ Reply.)

ORDER- 19

possessor."); *Williamson v. Allied Grp., Inc.*, 72 P.3d 230, 233 (Wash. Ct. App. 2003) ("[T]he fact that the owner's duty is nondelegable does not relieve the contractor of the duty to assure that the site is safe for invitees while the work is being performed.  Indeed, *Blancher* stands for [the proposition that] liability was properly attributed to contractors *as well as* to the owner.").

In the specific context of a slip and fall involving a wet floor, "Washington cases make it clear that the mere presence of water on a floor where the plaintiff slipped is not enough to prove negligence on the part of the owner or occupier of the building." *Kangley v. United States*, 788 F.2d 533, 534 (9th Cir. 1986) (citing Washington law). "[T]he plaintiff must prove that water makes the floor dangerously slippery and that the owner knew or should have known that water would make the floor slippery and that there was water on the floor at the time plaintiff slipped." *Id.*

   b.  *Negligence by an Independent Contractor on a Premises Liability Theory*

ABM is an independent contractor of the Port's, not the landowner or possessor of the premises where Ms. Sudre fell.  (*See* Compl. ¶ 1.4; ABM Answer ¶ 1.4.)  However, "applicable principles of premises liability impose upon the contractor the same duty as the landlord [or other possessor of land] with respect to a dangerous condition created on the land by the contractor's work."  *Williamson*, 72 P.3d at 231; *but see Ingersoll*, 869 P.2d at 1017 (noting without deciding that ABM, which contracted with a shopping mall to perform janitorial services, may have been subject to a different duty than the

//

//

1   landowner due to ABM's status as an independent contractor).[8]  "A contractor's

2   liability . . . is limited to harm caused by a condition created by the contractor."

3   *Williamson*, 72 P.3d at 234.

4          *c.  Defendants' Arguments*

5         In moving for summary judgment, Defendants argue that Plaintiffs have no

6   evidence to prove actual or constructive notice of a dangerous condition at any of the

7   three sites that the relevant witnesses testified Ms. Sudre fell.  (MSJ at 11-13.)  As to the

8   site to which Ms. Sudre testified, Defendants contend that "even if one were to infer that

9   some type of unknown substance was wiped from Mrs. Sudre's shoe, there is no evidence

10  as to what this substance was, or for how long it had been, presumably, on the floor."

11  (*Id.* at 11.)  Defendants also argue that even if Ms. Sudre fell where her husband recalls

12  her falling, there is no evidence that Defendants "knew or should have known of the

13  existence of fluid at this location."  (*Id.*)  As to these two versions of events, Defendants

14  argue that "there is no evidence that the Defendants had a reasonable opportunity to learn

15  of its existence or to thereafter remove the substance from the floor."  (*Id.* at 11-12.)

16  Finally, Defendants argue that under Defendants' employees' version of events, Mr.

17  Aguilar observed the spill that looked like a mocha, cleaned it up, put a wet floor sign

18  over the spill, and waited by the spill with his cart.  (*Id.* at 12.)  Under this scenario,

19

20      [8] Defendants assert in their motion for summary judgment that ABM owed a different

21  duty of care to Ms. Sudre because ABM is an independent contractor.  (*See* MSJ at 10.)
    Defendants cite no other case than *Ingersoll*, however, to support their position.  (*Id.*)

22  Accordingly, the court is unpersuaded that ABM owed a different duty of care than the Port
    based on the authority discussed above.  (*Id.*)

1 Defendants contend that Ms. Sudre saw the cone but "nevertheless walked into the area

2 where the cone, the maintenance cart, and Mr. Aguilar and Mr. Lisk were located and

3 then slipped and fell." (*Id.*) For these reasons, Defendants contend that they cannot be

4 liable for Ms. Sudre's fall under any of these three scenarios because they did not have

5 actual or constructive knowledge of an unsafe condition.

6          d.  *Plaintiffs' Arguments*

7          In response, Plaintiffs counter that they do not need to establish notice because

8 there is sufficient evidence that Defendants created the unsafe condition.[9] (MSJ Resp. at

9 10-11.) Plaintiffs assert that "a reasonable jury could very well determine, on the

10 preponderance of the evidence that [Ms. Sudre] slipped and fell on a floor that had been

11 recently mopped by Mr. Aguilar and that Mr. Aguilar had failed to barricade" the spill.

12 (*Id.* at 13 (capitalization omitted).) Plaintiffs argue specifically that this conclusion is

13 supported by Mr. Sudre's observation that the floor looked like it had recently been

14 mopped, the Sudres' testimony that a maintenance man apologized after Ms. Sudre's fall,

15 the Sudres' testimony that Ms. Sudre "remained at a distance from the cone" as she

16 exited the walkway, and the size of the wet area that Mr. Sudre observed. (*Id.* at 12.)

17 Plaintiffs also argue that even if they must establish notice, "a reasonable jury could still

18 _____

19          [9] Defendants state in passing that Plaintiffs have "created a totally imaginary version of
the slip and fall location to fit [their] new theory of the case that the Defendants created the

20 hazard where [Ms.] Sudre fell." (MSJ Reply at 6.) Although it is true that a district court does
not err when it refuses to entertain a new theory of liability raised for the first time at the

21 summary judgment stage, *see Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1291-92 (9th Cir.
2000), Plaintiffs' complaint contains factual allegations related to Defendants causing the

22 dangerous floor condition (*see* Compl. ¶¶ 3.4, 3.8). Further, if Defendants intended to make this
argument, they have not adequately briefed it.

1  conclude that Mr. Aguilar had been negligent in not detecting a spill in the immediate or

2  close vicinity of where he was working." (*Id.* at 13.)  In addition, Plaintiffs contend that

3  "due to the fact that Defendants have a wholly inadequate system in place for detecting

4  spills, a reasonable jury could infer constructive notice and negligence on the part of

5  Defendant ABM." (*Id.*)

6         *e. The Court's Ruling*

7         The court must construe all reasonable inferences in the light most favorable to

8  Plaintiffs. *See Scott*, 550 U.S. at 380.  Under this standard, the court concludes that

9  Plaintiffs have presented sufficient evidence to withstand summary judgment on the

10  theory that Defendants caused the unsafe condition, such that Defendants' actual or

11  constructive knowledge is irrelevant.[10] *See Iwai*, 915 P.2d at 1097 (stating that a plaintiff

12  may prove negligence on a premises liability theory by proving that the possessor of the

13  land caused the unsafe condition).  Even if Plaintiffs' evidence is less than robust, it

14

15      [10] As the court discussed above, ABM owed Ms. Sudre a duty of care as an invitee. *See supra* § III.B.2.6; *Williamson*, 72 P.3d at 231.  Thus, the court's analysis applies to both the Port

16  and ABM.  However, even if Defendants were correct that ABM's duty is distinct from the Port's because ABM was an independent contractor, Defendants nevertheless addressed ABM's

17  duty only in terms of whether ABM was on notice of the unsafe condition.  (*See* MSJ at 11 ("[T]here is no evidence that the Defendants could have had actual or constructive knowledge of

18  such a hazard because there is no evidence that a hazard actually existed at [the location at which Ms. Sudre testified she fell]."), 12 ("[I]f a jury were to believe that [Ms.] Sudre fell where her

19  husband recalls she fell, there is no evidence that Mr. Aguilar knew or should have known of the existence of fluid at this location.").  Further, Plaintiffs have produced evidence from ABM's

20  operations manager, George Perkins, about many aspects of how ABM must meet its standard of care, including how to barricade the clean-up of spills, how to adequately warn of a wet floor, and that areas surrounding a spill must also be checked and cleaned up.  (*See* MSJ Resp. at 7

21  (citing Perkins Dep. (Dkt. # 43) at 12:20-22, 14:3-6, 15:1-19, 24:5-25:3.)  Accordingly, Defendants do not meet their burden of showing that Plaintiffs lack evidence to show that ABM

22  breached its duty or by producing their own evidence to negate an essential element of Plaintiffs' case. *See Nissan Fire*, 210 F.3d at 1106.

1  amounts to more than a "mere . . . scintilla of evidence." *Anderson*, 477 U.S. at 252.

2  Specifically, Mr. Sudre observed that the floor looked like it had recently been mopped

3  and the wet area was approximately one meter by one meter.  (M. Sudre Dep. at

4  34:23-35:3, 31:19-23, 32:17-19; Sudre Decl. ¶¶ 11-12.)  In addition, the Sudres testified

5  that the maintenance man wiped Ms. Sudre's shoes, which both Plaintiffs testified were

6  wet (E. Sudre Dep. at 34:16-18, 1416-17; M. Sudre Dep. at  31:19-23, 32:17-19 (The area

7  was "wet around my wife, around her shoes.")) and about Ms. Sudre's path and distance

8  from the cone as she exited the walkway (E. Sudre Dep. at 10:18-11:19; M. Sudre Dep. at

9  30:13-21).  In addition, Mr. Aguilar was cleaning in the general location where Mr. Sudre

10  testified Ms. Sudre fell, which provides further evidence from which a jury could find

11  that Defendants caused the dangerous condition.[11]  (Aguilar Dep. at 68.)  On these facts,

12  a jury could reasonably conclude that Ms. Sudre slipped and fell because of an unsafe

13  condition that Defendants created.[12]  The credibility of the testimony or the weight of the

14  evidence is not for the court to decide on this motion for summary judgment and are

15  considerations properly directed to the jury.  *See Anderson*, 477 U.S. at 249-50.

16  _____

17  [11] The court further notes that in their reply in support of their motion to exclude
   Plaintiffs' expert William Martin, Defendants argue that even if Ms. Sudre fell at the site
18  identified by Mr. Sudre, "the spill could have been caused by a passenger, who cleaned it up
   before Mr. Aguilar and Mr. Lisk arrived at the location."  (Defs.' Mot. to Excl. Reply at 5.)
19  While this inference may be permissible, the court is not to weigh the evidence or decide
   between multiple reasonable inferences at this stage.  *See Anderson*, 477 U.S. at 249-50.

20  [12] The court does not take into account Mr. Sudre's testimony that a maintenance man
21  apologized after Ms. Sudre's fall (*see* M. Sudre Dep. at 37:5-11; Sudre Decl. ¶¶ 14-15) because
   the court has not yet ruled on the admissibility of that testimony, *supra* § III.A.4.  Thus, even
22  without the testimony, there is sufficient evidence on this theory to withstand summary
   judgment.

1   In addition, although Defendants note that a plaintiff seeking to prove negligence

2 from a wet floor in a premises liability case must prove that the floor was unreasonably

3 dangerous when wet (*see* MSJ at 8-9; MSJ Reply at 4); *Kangley*, 788 F.2d at 534,

4 Defendants do not argue that Plaintiffs cannot prove the floor was unreasonably

5 dangerous nor do they present their own evidence to show that the floor was not

6 unreasonably dangerous when wet in the manner Mr. Sudre described (*see* MSJ at

7 8-13).[13]  Finally, the court notes that Defendants have not argued specifically on

8 summary judgment that if Ms. Sudre encountered a danger that was known or obvious to

9 her, Defendants should not have anticipated the harm even in the face of such knowledge

10 or obviousness.  (*See generally* MSJ; MSJ Reply at 5 ("Under the Defendants' version

11 [of events], . . . [Ms.] Sudre walked right into this open and obvious[,] warned[-]about

12 area and slipped and fell."); *see Kamla*, 52 P.3d at 477.  For these reasons, Defendants

13 have not met their burden of demonstrating that no genuine disputes of material fact exist

14 as to whether Defendants created the unsafe condition.

15   However, no genuine dispute of material facts exists as to whether Defendants had

16 actual or constructive notice of an unsafe condition caused by someone other than

17 Defendants.  Defendants sufficiently point to a lack of evidence to support a finding that

18 an unsafe condition had existed for an adequate length of time such that Defendants

19

20   [13] Defendants bring a motion to exclude Plaintiffs' expert William Martin, who opines as

21 to the unreasonably dangerous nature of the floor at STIA when wet.  (*See* Defs.' MTE); *infra*
§ III.D.1.  Although it is not clear to the court that Plaintiffs would be able to prove that the

22 floor—if wet—was unreasonably dangerous without Mr. Martin's testimony, Defendants have
not raised that issue in their motion for summary judgment.  (*See generally* MSJ.)

should have known about it in exercising due care.  (*See* MSJ at 3-6 (discussing the lack of any evidence in Mr. Sudre's, Ms. Sudre's, Mr. Aguilar's, and Mr. Lisk's deposition testimony regarding the length of time the moisture had been present); MSJ Reply at 4-5 (same); E. Sudre Dep. at 13:5-11, 21:14-19; M. Sudre Dep. at 36:11-23.)  Plaintiffs point only to evidence demonstrating that Defendants' system for detecting spills "was wholly inadequate" (*see* MSJ Resp. at 13 (citing Perkins Dep. at 24:5-25:3)) and from there rely on speculative argument to support their position, *Nelson*, 83 F.3d at 1081-82 (stating that "mere allegation" does not create a factual dispute); *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982) ("Legal memoranda . . . are not evidence . . . .").[14]  Even if this evidence were sufficient to demonstrate that there is a genuine dispute as to whether Defendants' system is adequate, Plaintiffs do not present any evidence that a spill had existed for a sufficient length of time such that Defendants should have become aware of it during a reasonable inspection.  (*See* MSJ Resp. at 13); *Schmidt v. Coogan*, 173 P.3d 273, 275 (Wash. 2007) ("Whether a defective condition existed long enough so that it should have reasonably been discovered" is part of the inquiry into whether the defendant had knowledge of the condition.); *Iwai*, 915 P.2d at 1095 ("Plaintiffs carry the burden of showing the specific unsafe condition had existed for such time as would have afforded [the defendant] sufficient opportunity . . . to have made a proper inspection of the

_____

[14] In their reply, Defendants assert that "[u]nder one of [Plaintiffs'] counsel's imaginary versions of the slip and fall, counsel speculates that the moisture observed by Mr. Sudre was the result of the tracking of moisture from some unknown location to the spot where Mr. Sudre says Mrs. Sudre fell and that Mr. Aguilar was negligent in not detecting the tracked moisture at the location of Mrs. Sudre's fall."  (MSJ Reply at 4.)

1  premises . . . .").  The absence of any evidence to establish this fact is fatal to Plaintiffs'

2  ability to prove negligence based on this theory.[15]

3            *f.  Plaintiffs' Request for Summary Judgment*

4        Finally, Plaintiffs request that the court "dispose of [Defendants'] meritless

5  defense as to liability *sua sponte*."  (MSJ Resp. at 14.)  The court assumes that Plaintiffs

6  seek summary judgment on Defendants' affirmative defense that Ms. Sudre's own

7  negligence contributed to her fall and injuries.  (*Id.* ("Defendants [cannot] deny that the

8  wet[,] shiny marble floor was dangerous since it was not open and obvious."); Port

9  Answer at ¶ 6.2; ABM Answer ¶ 6.2.)  The court denies Plaintiffs' request for several

10  reasons.

11        First, the request is improper because, although Plaintiffs fashion the request as

12  one for the court to grant summary judgment *sua sponte*, Plaintiffs are in reality moving

13  for summary judgment.  (*See* MSJ Reply at 8-9.)  Local Civil Rule 7(k) directs "[a] party

14  filing a cross motion [for summary judgment to] note it in accordance with the local

15  rules," Local Rules W.D. Wash. LCR 7(k), and the court's scheduling order set the

16  dispositive motions deadline in this case for October 11, 2016 (Sched. Order (Dkt. # 23)

17  at 1).  Plaintiffs did not follow these rules, instead embedding their motion for summary

18  judgment in their response brief, which they filed on October 31, 2016.  (*See* MSJ Resp.

19  at 14.)

20  //

---

22     [15] Plaintiffs do not argue that Defendants had "actual notice" of the unsafe condition, and
the court does not address that theory of liability.  (*See* MSJ Resp.)

1    Second, the court finds that Plaintiffs have not shown that Defendants lack

2    evidence to show that Ms. Sudre was contributorily negligent or produced their own

3    evidence to negate an essential element of Defendants' defense.  (*See id.*); *Nissan Fire*,

4    210 F.3d at 1106.

5    Finally, the court has authority to *sua sponte* grant summary judgment in

6    Plaintiffs' favor "only [if] the losing party has reasonable notice that the sufficiency of

7    his or her claim [or defense] will be in issue."  *Norse v. City of Santa Cruz*, 629 F.3d 966,

8    971-72 (9th Cir. 2010) (internal quotations omitted).  The court finds that Defendants

9    would not have "reasonable notice" that their contributory negligence defense was in

10   question, even if the court were persuaded to enter summary judgment in Plaintiffs'

11   favor.  For these reasons, the court declines Plaintiffs' request.

12   **C.   Motion for Relief from Case Scheduling Order and Leave to Amend**

13   1.   Legal Standard

14   This motion is governed first by Federal Rule of Civil Procedure 16(b)(4).  When

15   the deadline for amending pleadings in the court's case scheduling order has passed, as is

16   the case here (*see* Sched. Order at 1), a party may amend its pleadings only on a showing

17   of "good cause" under Rule 16(b)(4), *Coleman*, 232 F.3d at 1294; *Johnson v. Mammoth*

18   *Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).  A party seeking to amend a

19   pleading after the date specified in the scheduling order must show "good cause" for

20   amendment under Rule 16(b)(4).  Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified

21   only for good cause and with the judge's consent."); *see Johnson*, 975 F.2d at 608.  "Rule

22   16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the

1   amendment." *Johnson*, 975 F.2d at 609.  To show "good cause" a party must show that it

2   could not meet the deadline in the scheduling order despite the party's diligence.  *Id*.

3       If a party shows "good cause," it must then demonstrate that the amendment is

4   proper under Federal Rule of Civil Procedure 15.  *See id.* at 608; *MMMT Holdings Corp.*

5   *v. NSGI Holdings, Inc.*, No. C12-1570RSL, 2014 WL 2573290, at *2 (W.D. Wash. June

6   9, 2014).  Rule 15(a)(2) requires the court to "freely give" leave to amend a pleading

7   "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  This policy is "applied with

8   extreme liberality."  *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th

9   Cir. 2001); *see also DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987);

10  *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

11      To assess the propriety of a motion for leave to amend, the court employs five

12  factors:  (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of

13  amendment, and (5) whether the party has previously amended its pleading.  *Allen v. City*

14  *of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (citing *Ascon Props., Inc. v. Mobil Oil*

15  *Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)); *see also Foman v. Davis*, 371 U.S. 178, 182

16  (1962).  "[P]rejudice to the opposing party . . . carries the greatest weight."  *Eminence*

17  *Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  The burden is on the

18  party opposing amendment to demonstrate that it will be prejudiced by an amendment.

19  *DCD Programs, Ltd.*, 833 F.2d at 187.

20      2.  Motion for Relief from Case Scheduling Order and to Amend Answer

21      Defendants seek to amend their answers to add an affirmative defense "to allow

22  them to pursue a non-party at fault defense against [Ms.] Sudre's French physician, Dr.

ORDER- 29

1   Lehreitani." (MTA at 1.)  Defendants contend there is good cause to allow them to

2   amend their answers and that amendment is proper under Federal Rule of Civil Procedure

3   15.  (*Id.* at 8-9.)

4          *a.  Good Cause Under Rule 16*

5          The court finds that Defendants have good cause for seeking amendment after the

6   May 11, 2016, deadline in the court's scheduling order.  (*See* Sched. Order at 1.)  The

7   record before the court indicates that the parties worked diligently to complete discovery,

8   particularly discovery related to Ms. Sudre's subsequent medical treatment.  (Markette

9   Decl. ISO MTA at 2-5.)  The parties' respective medical experts physically examined

10  Ms. Sudre in June 2016, and Defendants received Ms. Sudre's full medical file by late

11  August 2016.  (*Id.* at 5; Boone Decl. (Dkt. # 48) at 1).)  Defendants' expert, Dr.

12  Christopher Boone, then examined Ms. Sudre's medical file and updated his opinions on

13  August 31, 2016, nearly two weeks before the close of discovery.  (*See* Boone Decl. at 5;

14  Sched. Order at 1.)  In his update, Dr. Boone opined that Dr. Lehreitani had failed to

15  comply with applicable medical standards of care.  (*See* Boone Decl. at 5.)  Plaintiffs'

16  argument that Defendants cannot demonstrate good cause because they "did not complete

17  discovery on time" is simply incorrect.  (*Compare* MTA Resp. (Dkt. # 49) at 4 *with*

18  Sched. Order at 1.)  Based on these facts, the court concludes that Defendants could not

19  have met the case scheduling order's deadline to amend their answers, despite the parties'

20  diligence.

21  //

22  //

ORDER- 30

1

*b. Propriety of Amendment Under Rule 15*

2      The court grants Defendants leave to amend their answers because amendment

3   would not prejudice Plaintiffs, undue delay alone does not justify denying leave to

4   amend, amendment would not necessarily be futile, there is no evidence that Defendants

5   have acted in bad faith, and Defendants have not previously amended their answers.  *See*

6   *Eminence Capital*, 316 F.3d at 1052.  Defendants have not complied with Local Civil

7   Rule 15, however, and the court orders Defendants to do so before the court will accept

8   Defendants' amended answers as set forth below.  *See* Local Rules W.D. Wash. LCR 15

9   (requiring "[a] party who moves for leave to amend a pleading" to "attach a copy of the

10  proposed amended pleading as an exhibit to the motion . . . .").

11      i.   Prejudice

12      Prejudice means "undue difficulty in prosecuting a lawsuit as a result of a change

13  in tactics or theories on the part of the other party."  *Wizards of the Coast LLC v.*

14  *Cryptozoic Entm't LLC*, 309 F.R.D. 645, 652 (W.D. Wash. 2015).  Plaintiffs contend that

15  allowing Defendants to add this affirmative defense would require the court to reopen

16  discovery, which would delay the proceedings and prejudice Plaintiffs.  (MTA Resp. at

17  10.)  Specifically, Plaintiffs assert that "[o]btaining [Dr. Lehreitani's] testimony prior to

18  the trial date would prove impossible."  (*Id.*; Capp Decl. in Opp. to MTA ¶ 10.)  Plaintiffs

19  also argue that they would be prejudiced because it is unclear what choice of law would

20  apply if the court allows the proposed amendment and it may be impossible to join Dr.

21  Lehreitani as a party.  (MTA Resp. at 10.)  Defendants in turn argue there is no prejudice

22  because Plaintiffs' expert opined in his September 1, 2016, deposition that Dr. Lehreitani

1    did not commit malpractice in his treatment of Ms. Sudre.  (MTA Reply (Dkt. # 52) at 3.)

2    In addition, Defendants contend that "[t]o invoke RCW 4.22.070's allocation of fault,

3    there is no requirement the plaintiff be able to sue, to join, or to collect damages from the

4    non-party at fault."  (*Id.* at 2-3.)

5          The court concludes that Plaintiffs have not met their burden of demonstrating

6    amendment would prejudice them, even at this stage in the proceedings.  Plaintiffs give

7    no reason why Dr. Lehreitani's testimony is necessary when the medical experts the

8    parties have already retained have opined on whether Dr. Lehreitani provided negligent

9    care.  (*See generally* MTA Resp.; Boone Decl. at 5.)  Once Dr. Boone supplemented his

10   expert report—as he was required to do pursuant to Federal Rule of Civil Procedure 26(e)

11   and did before the discovery cut-off on September 12, 2016—to include his opinions as

12   to Dr. Lehreitani's standard of care, Plaintiffs' medical expert was entitled to rebut those

13   opinions within 30 days.  *See* Fed. R. Civ. P. 26(a)(2)(D)(ii).  Plaintiffs could have

14   moved the court to extend the discovery deadline for the limited purpose of securing their

15   expert's rebuttal opinions if this timeline posed problems, but Plaintiffs did not.  (*See*

16   Dkt.)  In addition, Plaintiffs' counsel deposed Dr. Boone on September 1, 2016, and

17   therefore had the opportunity to probe Dr. Boone's opinions as to Dr. Lehreitani's care.

18   (*See* Boone Dep. (Dkt. # 29).)

19         Further, Dr. Lehreitani does not need to be joined as a party, *see Kielkopf v.*

20   *United States*, No. C05-5831FDB, 2007 WL 765209, at *2 (W.D. Wash. 2007) (citing

21   *Geurin v. Winston Indus., Inc.*, 316 F.3d 879, 884 (9th Cir. 2002)), and it is not clear that

22   Dr. Lehreitani's testimony could be obtained because he is beyond the court's subpoena

1    power, *see* Fed. R. Civ. P. 45(c)(1)(A).  For these reasons, the court concludes that

2    Plaintiffs have not met their burden of showing that amendment would prejudice them.

3    *See DCD Programs, Ltd.*, 833 F.2d at 187.

4                        ii.  Undue Delay

5        Although Defendants delayed in seeking the court's leave to amend, undue delay

6    alone is insufficient to deny leave to amend.  *Webb*, 665 F.2d at 980.  Defendants first

7    decided to seek leave to amend their answers on August 31, 2016, the day Dr. Boone

8    provided his supplemental opinions after reviewing Ms. Sudre's entire file.  (*See* Capp

9    Decl. in Opp. to MTA ¶¶ 4-5, Ex. A (attaching Defendants' counsel's email stating,

10   "[w]e intend to file a motion to amend our answer to assert a non-party at fault defense

11   based upon Dr. Lehreitani's malpractice in treating your client.").)  Despite making this

12   decision on August 31, 2016, Defendants did not properly seek the court's leave to

13   amend[16] until October 13, 2016, less than two months before trial, a month after the close

14   of discovery, and two days after filing a motion for summary judgment and the

15   dispositive motions deadline.  (*See generally* Sched. Order; MSJ.)  Defendants' delay

16   therefore may have been undue, but this fact alone does not warrant denying amendment.

17                        iii. Futility

18       A proposed amendment is futile "if no set of facts can be proved under the

19   amendment to the pleadings that would constitute a valid and sufficient claim or

20   defense."  *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988); *accord*

21   _____

22       [16] Defendants first moved to amend their answers on September 21, 2016.  (Dkt. # 24).
     Defendants withdrew that motion, however, on October 6, 2016.  (Dkt. # 30.)

ORDER- 33

1    *Atkins*, 2011 WL 1335607, at *4.  "Denial of leave to amend [because of futility] is rare."

2    *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003); *see also Green*

3    *Valley Corp. v. Caldo Oil Co.*, No. 09–CV–04028–LHK, 2011 WL 1465883, at *6 (N.D.

4    Cal. Apr. 18, 2011) (noting "the general preference against denying a motion for leave to

5    amend based on futility").  Plaintiffs argue that the motion to amend is futile because

6    "Washington law clearly establishes that a tortfeasor who is responsible for another

7    person's bodily injury is also responsible for any harmful or negligent medical treatment

8    of injuries caused by the tortfeasor's negligent conduct."  (MTA Resp. at 7 (citing

9    *Lindquist v. Dengel*, 595 P.2d 934 (Wash. 1979)).)  Accordingly, Plaintiffs argue that

10   RCW 4.22.070, which directs "the trier of fact [to] determine the percentage of the total

11   fault which is attributable to every entity which caused the claimant's damages," RCW

12   4.22.070(1), does not modify the causation element.  (*Id.* at 7.)

13        Washington law encompasses both the original tortfeasor rule embodied in

14   *Lindquist* and allocation of fault for non-parties under the state's comparative negligence

15   statute.  *See Lindquist*, 595 P.2d at 936-37; RCW 4.22.070.  The court in *Lindquist*

16   adopted the *Restatement (Second) of Torts* § 457 rule that "'[i]f the negligent actor is

17   liable for another's bodily injury, he is also subject to liability for any additional bodily

18   harm resulting from normal efforts of third persons in rendering aid which the other's

19   injury reasonably requires, irrespective of whether such acts are done in a proper or a

20   negligent manner.'"  *Lindquist*, 595 P.2d at 936-37 (quoting *Restatement (Second) of*

21   *Torts* § 457).  In addition, Washington law generally permits "any party to a proceeding

22   [to] assert that another person is at fault."  *Wuth ex rel. Kessler v. Lab. Corp. of Am.*, 359

1  P.3d 841, 862 (Wash. Ct. App. 2015) (internal quotation omitted); *see also* RCW

2  4.22.070.  Further, "a defendant is entitled to shepherd evidence and attempt to prove that

3  the 'empty chairs' in a lawsuit are the proximate cause of the injuries alleged," *Kielkopf*,

4  2007 WL 765209, at *2 (citing *Geurin*, 316 F.3d at 884), but if an entity's conduct is not

5  a proximate cause of an injury, fault cannot be allocated to that entity, RCW 4.22.015.

6  As the Washington Court of Appeals noted in 1996, RCW 4.22.070 did not "abrogate[]

7  the common law *Lindquist* rule."[17]  *Henderson v. Tyrrell*, 910 P.2d 522, 542 n.17 (Wash.

8  Ct. App. 1996).  The Washington Court of Appeals did not, however, address whether

9  both rules may be invoked regarding subsequent medical malpractice.  *See id.*

10         The parties appear to agree that Washington's comparative negligence regime

11  does not abrogate the common law rule embodied in *Lindquist*.  (MTA Resp. at 7; MTA

12  Reply at 3.)  What the parties disagree on is whether Defendants may assert a non-party

13  at-fault affirmative defense given that *Lindquist* remains good law.  (*See* MTA Reply at

14  3.)  Although Washington courts have not substantively addressed this issue, other state

15  courts have.  Those courts have held that both the *Restatement (Second) of Torts* § 457—

16  the rule adopted in *Lindquist*—and the state's comparative fault rules can be invoked in

17  the same case.  *See, e.g.*, *Banks v. Elks Club Pride of Tenn.*, 301 S.W.3d 214, 224 (Tenn.

18  ────────────────────

19         [17] In making this statement, the Washington Court of Appeals expressed disagreement
    with a decision from the District Court for the Eastern District of Washington, *Workman v.*
20  *Chinchinian*, 807 F. Supp. 634, 643 (E.D. Wash. 1992), upon which Defendants rely.  (*See*
    MTA.)  In that case, the District Court allowed "evidence of negligence by subsequent
21  practitioners" at trial because it was "relevant and admissible" to the case in light of
    Washington's adoption of comparative fault.  *Id.*  The District Court made no comment,
22  however, on whether *Lindquist* remained good law after Washington enacted its comparative
    fault statute.  *See id.*

1    2010); *Cramer v. Slater*, 204 P.3d 508, 514 (Idaho 1009).  For example, the Tennessee

2    Supreme Court concluded that the court's later adoption of a comparative negligence rule

3    did not "prevent the continuing imposition of liability on an original tortfeasor for

4    subsequent negligent medical care for the injuries caused by the original tortfeasor."

5    *Banks*, 301 S.W.3d at 224 (collecting cases).  Similarly, the Supreme Court of Idaho

6    concluded that "because Idaho has adopted comparative fault, the *Restatement (Second)*

7    *of Torts* § 457 operates as a general foreseeability rule for any subsequent medical

8    negligence and does not impute liability arising from all subsequent negligent acts onto

9    the original negligent actor." *Cramer*, 204 P.3d at 514.  Based on the foregoing authority

10   and the unsettled nature of the application of *Lindquist* and comparative fault principles

11   under Washington law, the court concludes that Defendants' proposed amendment is not

12   futile.[18]

13        The court also denies Plaintiffs' request to strike Dr. Boone's second and third

14   declarations.  (*See* MTA Surreply (Dkt. # 62).)  Dr. Boone's second declaration clarifies

15   his deposition testimony, which Dr. Boone is permitted to do.  (*Compare* 2d Boone Decl.

16   (Dkt. # 53) *with* Boone Decl.); *Van Asdale*, 577 F.3d at 999 (A party "is not precluded

17   from elaborating upon, explaining[,] or clarifying prior testimony elicited by opposing

18   counsel on deposition.")  The declaration is dated October 6, 2016, just over a month

19

20        [18] At trial, Plaintiffs may again argue that Defendants are not entitled to submit this issue
21   to the jury by moving for judgment as a matter of law as to this defense and "specify[ing] the
     judgment sought and the law and facts that entitle the movant to the judgment."  Fed. R. Civ. P.
22   50(a)(2).  That standard, however, is distinct from the futility standard upon which the court must
     decide whether to allow Defendants to amend their answers to assert this defense.

1    after Dr. Boone's deposition on September 1, 2016.  (*See* 2d Boone Decl.)  Plaintiffs

2    have not argued that Dr. Boone made these clarifications over 30 days after receiving his

3    deposition transcript, so the court has no basis on which to find that the declaration

4    constitutes an untimely correction under Federal Rule of Civil Procedure 30(e)(1).  (*See*

5    *generally* MTA Resp.; MTA Surreply); Fed. R. Civ. P. 30(e)(1).  Dr. Boone's third

6    declaration appears to have been prepared in support of Defendants' instant motion to

7    clarify which standard of care Dr. Boone asserts that Dr. Lehreitani failed to meet.  (*See*

8    3d Boone Decl. (Dkt. # 54).)  Although the declaration would be untimely under the

9    court's scheduling order if the declaration contained new opinions, Plaintiffs have not

10   made this argument.  (*See generally* MTA Surreply.)  Finally, Dr. Boone's declarations

11   are made on personal knowledge because Dr. Boone is serving as an expert medical

12   witness in this case and states that he personally examined Ms. Sudre and her medical

13   file.  (*See* MTA Surreply at 2; 2d Boone Decl.; 3d Boone Decl.); *Bellah*, 623 F. Supp. 2d

14   at 1186.

15        The court further determines that Plaintiffs' request to strike Dr. Boone's second

16   and third declarations appears to be a late attempt to exclude portions of Dr. Boone's

17   testimony.  This late attempt to challenge the expert testimony comes after the court's

18   deadline for challenging expert testimony, however, and is therefore improper.  (*See*

19   Sched. Order at 1 (setting deadline for challenging expert testimony on October 11,

20   2016).)  It is possible that allowing Defendants to add an affirmative defense premised on

21   a nonparty's medical malpractice, which requires expert testimony, after the deadline for

22   challenging expert witness testimony could in some way prejudice Plaintiffs.  However,

1    Plaintiffs do not make this argument (*see generally* MTA Resp.), and the court concludes

2    that Plaintiffs have waived it, *see, e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir.

3    2008).

4                         iv.  Bad Faith and Previous Amendments

5          There is no indication that Defendants act in bad faith in seeking this amendment,

6    and Defendants have not previously amended their answers.  (*See generally* MTA; MTA

7    Resp.; Dkt.)  Accordingly, these factors do not affect the court's decision.

8                *c.  Amendment Contingent on Compliance with Local Civil Rule 15*

9          Finally, the court notes that Defendants fail to comply with Local Civil Rule 15,

10   which requires "[a] party who moves for leave to amend a pleading . . . [to] attach a copy

11   of the proposed amended pleading as an exhibit to the motion . . . ."  Local Rules W. D.

12   Wash. LCR 15; *see also Robertson v. GMAC Mortg. LLC*, No. C12-2017MJP, 2013 WL

13   2278109, at *1 (W.D. Wash. May 23, 2013) ("The Court denies the motion [to amend]

14   because Plaintiff fails to comply with LCR 15."); *Young v. Quality Loan Serv. Corp.*, No.

15   C14-1713RSL, 2015 WL 12559901, at *1 (W.D. Wash. July 7, 2015) (denying leave to

16   amend pleading in part because the plaintiff had not "provided a copy of the proposed

17   amended pleading for the Court's review as required by LCR 15"); *Veracruz v. Hendrix*,

18   No. C14-6029BHS, 2015 WL 5840065, at *2 (W.D. Wash. Oct. 7, 2015) (denying leave

19   to amend in part because the party seeking amendment had failed to comply with LCR

20   15); *Ejonga-Deogracias v. Dep't of Corr.*, No. C15-5784RJB-KLS, 2016 WL 3180289,

21   at *1 (W.D. Wash. May 17, 2016) (stating that court had denied amendment without

22   prejudice for failure to comply with LCR 15).  Local Civil Rule 15 further instructs that

1    "[t]he party must indicate on the proposed amended pleading how it differs from the

2    pleading that it amends by bracketing or striking through the text to be deleted and

3    underlining or highlighting the text to be added." *Id.*  Defendants attached no such

4    exhibit with their motion to amend.  (*See generally* MTA; Dkt.)  The court therefore

5    conditions its grant of Defendants' motion to amend their answers on Defendants' proper

6    submission to the court of their proposed amended answers.  Should Defendants attempt

7    to alter their answers in any way beyond asserting the non-party at fault affirmative

8    defense they address in their motion, the court will not permit Defendants to file their

9    amended answers.  Defendants must file their proposed amended answers on the docket

10   no later than Friday, December 9, 2016, at 12:00 p.m.  Failure to timely do so will result

11   in the court precluding Defendants from amending their answers.

12   **D.    Motions to Exclude Expert Testimony**

13        1. <u>Legal Standard</u>

14        A court has broad discretion to admit expert testimony if it meets the requirements

15   of Federal Rule of Evidence 702.  *See United States v. Murillo*, 255 F.3d 1169, 1178 (9th

16   Cir. 2001) (noting the court's broad discretion to assess the relevance and reliability of

17   expert testimony); Fed. R. Evid. 702.  Under Rule 702, a witness who "is qualified as an

18   expert by knowledge, skill, experience, training, or education" may testify as an expert if:

19   (1) "the expert's . . . specialized knowledge will help the trier of fact to understand the

20   evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or

21   data"; (3) "the testimony is the product of reliable principles and methods"; and (4) the

22   witness "has reliably applied the principles and methods to the facts of the case."  Fed. R.

Evid. 702.  The district court must "perform a gatekeeping function to ensure that the

expert's proffered testimony is both reliable and relevant."[19]  *United States v. Christian*,

749 F.3d 806, 810 (9th Cir. 2014) (internal quotation omitted).  "Relevancy simply

requires that '[t]he evidence . . . logically advance a material aspect of the party's case.'"

*Estate of Barabin v. Astenjohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (quoting

*Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007)).  Reliability requires the court to

assess "whether an expert's testimony has 'a reliable basis in the knowledge and

experience of the relevant discipline.'"  *Id.* (quoting *Kumho Tire Co., Ltd. v. Carmichael*,

526 U.S. 137, 149 (1999) (citation and alterations omitted)).  The party seeking to admit

the expert testimony bears the burden of proving that it is admissible.  *See Medvedeva v.*

*City of Kirkland*, C14-0007RSL, 2015 WL 11233199, at *1 (W.D. Wash. May 18, 2015).

The Supreme Court has suggested several factors that courts can use in

determining reliability:  (1) whether a theory or technique can be tested; (2) whether it

has been subjected to peer review and publication; (3) the known or potential error rate of

the theory or technique; and (4) whether the theory or technique enjoys general

acceptance within the relevant scientific community.  *See Daubert v. Merrell Dow*

*Pharm., Inc.*, 509 U.S. 579, 592-94 (1993).  The reliability inquiry is flexible, however,

and trial judges have broad latitude to focus on the considerations relevant to a particular

case.  *Kumho Tire*, 526 U.S. at 150.  For example, where the expert's testimony is "based

---

[19] Pretrial *Daubert* hearings are not required for the court to perform its gatekeeper role because "[t]he trial judge . . . has broad latitude in determining the appropriate form of the inquiry."  *Estate of Barabin*, 740 P.3d at 463.

1   on some 'other specialized knowledge,'" "[t]he *Daubert* factors (peer review,

2   publication, potential error rate, etc.) simply are not applicable" because the reliability of

3   this kind of testimony "depends heavily on the knowledge and experience of the expert,

4   rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d

5   1160, 1168-69 (9th Cir. 2000).  In these instances, the court examines "the expert's

6   relevant knowledge and experience to determine if he may testify." *Hassebrock v. Air &*

7   *Liquid Sys. Corp.*, C14-1835RSM, 2016 WL 4496917, at *2 (W.D. Wash. Apr. 11,

8   2016).  In determining reliability, the court must rule not on the correctness of the

9   expert's conclusions but on the soundness of the methodology, *Estate of Barabin*, 740

10  F.3d at 463 (citing *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)), and the

11  analytical connection between the data, the methodology, and the expert's conclusions,

12  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Fed. R. Evid. 702 advisory

13  committee's notes to 2000 amendments ("[T]he testimony must be the product of reliable

14  principles and methods that are reliably applied to the facts of the case.").

15         In addition to the foregoing requirements, an expert witness may not give an

16  opinion on his "*legal conclusion*, i.e., an opinion on an ultimate issue of law." *Hangarter*

17  *v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal quotations

18  omitted).  Further, "instructing the jury as to the applicable law is the distinct and

19  exclusive province of the court." *Id.* (internal quotations omitted).

20         2.   Defendants' Motion to Exclude William Martin's Testimony

21         Plaintiffs retained Mr. Martin "to determine if the walking surface [at STIA] was

22  dangerous in a manner that caused Ms. Sudre's fall and injuries."  (Northcraft Decl. ISO

1   Defs.' MTE (Dkt. # 34) ¶ 1, pp. 6-19 ("Martin Rep.") at 5.)  Mr. Martin offers four

2   opinions:

> (1) the floor where Ms. Sudre fell "was far more slippery when wet [than]
> when dry, and was dangerous in a manner that caused Ms. Sudre's fall and
> injuries"; (2) Defendants' "failure to barricade or otherwise reliably warn
> passengers of the foreseeable condition of a dangerously slippery walking
> surface caused Ms. Sudre's fall and injuries; (3) "[t]hrough their failure to
> comply with the standards of care for walkway safety," Defendants
> "allowed a dangerous walkway condition to exist and caused Ms. Sudre's
> fall and injuries; and (4) ABM "violated the standards of care for premises
> safety" through its "failure to barricade or warn of the dangerous condition
> until it was made safe."

(*Id.* at 8.)  Defendants contend that these four opinions encompass two broad categories:

(1) that the floor at STIA was dangerously slippery when wet, and (2) that the Port and

ABM's policies, practices, and procedures to inspect, detect, and clean up spills were

inadequate.  (Defs.' MTE at 3-4.)  The court likewise addresses Mr. Martin's opinions in

this manner.  In doing so, the court concludes that Mr. Martin may testify as to the nature

of the floor at STIA when wet, but not as to the sufficiency of Defendants' policies and

practices for the reasons set forth below.

### a.  Nature of the Floor When Wet

Defendants have not contested Mr. Martin's qualifications or the relevance or

reliability of his testimony as to his first opinion.  (*See generally* Defs. MTE.)  However,

in its gatekeeper role, the court must determine whether Mr. Martin's testimony is

admissible as expert testimony.  *Christian*, 749 F.3d at 810.  The court first finds that Mr.

Martin is qualified to give expert testimony on the slip resistance of the floor at STIA

based on his knowledge, training, and education.  *See* Fed. R. Evid. 702.  Mr. Martin is a

1  licensed architect with a Bachelor of Arts degree in architecture from Yale University

2  and a Masters of Architecture from the University of Washington.  (Martin Rep. at 5.)

3  He has "expertise and experience analyzing floor safety and [has] training in accurately

4  measuring the slip resistance of floor surfaces."  (*Id.*)  Further, Mr. Martin is a "CXLT

5  Tribometrist," which is a "slip resistance metering certified operator," and is also "a

6  member of organizations that develop national standards for flooring and walkway

7  safety."  (*Id.*)  Mr. Martin's testimony will also help the jury to understand a fact in

8  issue—whether the floor at STIA was dangerous when wet as Plaintiffs contend the floor

9  was at the time Ms. Sudre fell.  *See supra* § III.B; Fed. R. Evid. 702.

10      Mr. Martin's testimony as to this subject is relevant and reliable.  *See* Fed. R.

11  Evid. 702(c)-(d); *Estate of Barabin*, 740 F.3d at 463.  First, Mr. Martin's testimony is

12  relevant because Plaintiffs must establish that the floor at STIA was dangerously slippery

13  when wet.  *See Kangley*, 788 F.2d at 534; *Estate of Barabin*, 740 F.3d at 463 (stating that

14  relevancy requires the evidence to logically advance a material part of the case).  Second,

15  Mr. Martin's report and deposition demonstrate that he used a reliable method for

16  measuring slip resistance and reliably applied it in this case.  Mr. Martin testified that he

17  conducted a slip test to determine whether the floor at three locations near where Ms.

18  Sudre fell became dangerously slippery when wet.  (Northcraft Decl. ISO Defs.' MTE

19  ¶ 2, pp. 20-150 ("Martin Dep.") at 47:3; Martin Rep. at 7.)  He used an English XL

20  Variable Incidence Tribometer in accordance with the requirements of ASTM F2508 to

21  conduct his test.  (Martin Dep. at 47:3; Martin Rep. at 7.)  Multiple courts have concluded

22  that expert testimony based on the use of such tribometers to measure the slip resistance

of floors is reliable.  *Michaels v. Taco Bell Corp.*, Civ. No. 10-1051-AC, 2012 WL
4507953, at *1-*2, *4 (D. Or. Sept. 27, 2012) (concluding that proffered expert's expert
testimony based on using a tribometer to conduct slip-resistance testing was reliable);
*Feuerstein v. Home Depot, U.S.A., Inc.*, No. 2:12-cv-01062 JWS, 2014 WL 2616582, at
*2-*3 (D. Ariz. June 12, 2014) (same); *Steffen v. Home Depot U.S.A., Inc.*, No.
CV-13-199-JLQ, 2014 WL 1494108, at *6-*7 (E.D. Wash. Apr. 16, 2014) (same).

Mr. Martin further establishes that he has reliably applied this methodology to this
case by pointing out that a widely used measure of slip resistance establishes that a slip
resistance of 0.5 or higher is generally considered safe.  (Martin Rep. at 7.)  During his
tests, Mr. Martin found that the three locations had an average slip resistance index of
between 0.25 and 0.26 when he added water to the floor.[20]  (*Id.*)  Further, Mr. Martin's
method is corroborated by Defendants' own witness, ABM's George Perkins, who
testified that "[a]nything below 0.5 is too slippery."  (*See* Martin Rep. at 9 (citing Perkins
Dep.)).

Now that the court has determined Mr. Martin's testimony is relevant and reliable,
the court turns to Defendants' argument that this testimony contravenes Washington law.
Defendants argue that Mr. Martin's testimony "advocates that the Defendants are liable
where there is moisture on the floor and the slip resistance coefficient falls below .5."
(Defs.' MTE at 11.)  In contrast, they argue, Washington law "makes it clear that the

---

[20] This finding appears to be consistent with Defendants' expert's test of the wet floor
using an English XL Variable Incidence Tribometer.  (*See* Capp. Decl. ISO Pls.' MTE (Dkt.
#37-1) ¶ 2, Ex. G ("Black Rep.") at 68.)

ORDER- 44

1   mere presence of water on a floor where the plaintiff slipped is not enough to prove

2   negligence on the part of the owner or occupier of the building."  (*Id.* (citing *Kangley*,

3   788 F.2d at 534).)  Although Defendants are correct that under Washington law, "the

4   plaintiff must prove that water makes the floor dangerously slippery and that the owner

5   knew or should have known both that water would make the floor slippery and that there

6   was water on the floor at the time the plaintiff slipped," *Kangley*, 788 F.2d at 534,

7   Defendants are incorrect in asserting that Mr. Martin's testimony as to the point at which

8   the floor at STIA becomes dangerously slippery requires Mr. Martin to opine on the

9   amount of time that the water had been present on the floor.[21]  (*See* Defs.' MTE at 11

10  ("To [Mr. Martin], it does not matter whether a spill existed for 30 seconds prior to a fall

11  as the possessor of land or janitorial company should have cleaned it up regardless.").)

12  Although it is the court's province to instruct the jury, Mr. Martin's opinion that the floor

13  at STIA is unsafe when wet is not contrary to Washington law.  Accordingly, the court

14  denies Defendants' motion to exclude this testimony.

15                    b.  *Standard of Care for Policies and Procedures*

16          Defendants next argue that Mr. Martin's testimony about the policies and

17  procedures Defendants should have employed to maintain reasonably safe premises

18  should be excluded because it is unreliable and improperly instructs the jury as to what

19  result it should reach.  (*See id.* at 9.)  Specifically, Defendants argue that Mr. Martin does

20  not have knowledge of the relevant "standard of care applicable to this case."  (*Id.*)

21  _____

22  [21] *See supra* § III.B.

ORDER- 45

1    Because he does not have such knowledge, Defendants argue that Mr. Martin's opinions

2    about the inadequacy of Defendants' practices are unreliable.  (*Id.*)  The court agrees that

3    Plaintiffs have not met their burden of demonstrating that Mr. Martin's testimony on this

4    subject "'has a reliable basis in the knowledge and experience of the relevant discipline.'"

5    *Estate of Barabin*, 740 F.3d at 463 (quoting *Kumho Tire*, 526 U.S. at 149).

6          For these non-scientific opinions, the court evaluates whether Mr. Martin's

7    experience or knowledge qualify him to testify as an expert.  *See Hankey*, 203 F.3d at

8    1168-69.  Plaintiffs have not demonstrated that Mr. Martin has the necessary expertise to

9    testify on this topic.[22]  As discussed above, Mr. Martin's resume indicates that he is an

10   architect with expertise in floor safety and that his education "included the study of

11   physics, material properties, selection of materials for use in floor surfaces, relevant

12   codes and standards, and human factors related to the use of buildings."  (Martin Rep. at

13   5.)  But Mr. Martin does not indicate that he has knowledge of or experience with the

14   relevant standard of care for policies and practices to maintain safe floors or how

15   janitorial services should be carried out to maintain floor safety.  (*See id.* at 12.)

16         In addition, Mr. Martin's report contains little reasoning to demonstrate that his

17   opinions concerning policies and practices are reliable.  Plaintiffs state that Mr. Martin's

18   opinions on the standard of care Defendants should have applied through their practices

19   _____

20         [22] The court is not required to scour the record to determine if there are facts that support
     either party's position.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
21   Practices, & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1093 n.66 (C.D. Cal. 2013) (noting that
     the party "failed to cite to evidence of record") (citing *Orr*, 285 F. 3d at 774-75); *Fleischer
22   Studios, Inc. v. A.V.E.L.A., Inc.*, No. 2:06-CV-06229 FMC, 2009 WL 7464165, at *2 (C.D. Cal.
     Feb. 18, 2009)).  Rather, the parties are expected to bring to the court's attention relevant facts.

1   and procedures are "that the floor must be kept in a safe condition" and "the system [for

2   keeping the floor safe] should be effective."  (Defs.' MTE Resp. (Dkt. # 64) at 5.)  To

3   form his opinions, Mr. Martin read ABM's employee training manual, an ABM

4   document on effective barricading, and deposition testimony from Mr. Perkins and Mr.

5   Lisk.  (Martin Rep. at 5-6.)  He also "[s]lip tested the floor" and "researched the

6   standards of care that were applicable."  (Martin Dep. at 15:16-17.)  However, in

7   translating this information to an opinion on Defendants' policies, Mr. Martin conflates

8   the floor's slipperiness with the adequacy of Defendants' policies.  Mr. Martin opines in a

9   conclusory fashion that Defendants' practices are inadequate based solely on the fact that

10  the floor was allegedly wet in this instance.

11          For example, relying only on Ms. Sudre's testimony about where her fall occurred,

12  Mr. Martin concludes that Defendants "failed to execute the measures testified to by

13  [Mr.] Lisk and [Mr.] Perkins."  (Martin Rep. at 7.)  Mr. Martin also testified that

14  Defendants "don't appear to have a reliable way to find [spills] . . . [a]nd if they did find

15  [a spill], then they didn't clean it up properly."  (Martin Dep. 78:6-9.)  He further testified

16  that "the standard of care [is] that the floor requires a high level of maintenance because

17  it is slippery when it's wet."  (*Id.* at 105:10-13.)  Mr. Martin also stated repeatedly in his

18  deposition that he was not opining on the adequacy of Defendants' practices and policies

19  for locating and cleaning up spills, although that is exactly what he does in his report.

20  (*Compare* Martin Dep. at 101:13-25, 112:11-113:12, 119:12-121:22, 123:11-125:20,

21  126:2-12 *with* Martin Rep. at 8.)  These bald assertions do not demonstrate that Mr.

22  *//*

1    Martin has adequate knowledge or experience to opine on whether Defendants had

2    adequate practices and policies.

3         Mr. Martin also cites three publications as bases for his knowledge in forming

4    these opinions: (1) the Port Authority of New York and New Jersey's Pedestrian Falling

5    Accidents in Transit Terminals, (2) the National Safety Council's Data Sheet 495, Slips,

6    Trips, and Falls on Floors, and (3) ANSI's A1264.2 Provision of Slip Resistance on

7    Walking, Working Surfaces. (Martin Rep. at 6-7.) He does not explain, however,

8    whether professionals in the field rely on these publications in formulating opinions as to

9    the appropriate standard of care. (*See generally id.*) In addition, Plaintiffs do not cite any

10   opinions of other experts or any cases where federal courts have accepted a similar basis

11   for these types of opinions. (*See* Defs.' MTE Resp.) Accordingly, Mr. Martin's opinions

12   about Defendants' practices are not "the product of reliable principles and methods" nor

13   has Mr. Martin "reliably applied the principles and methods to the facts" of this case.

14   Fed. R. Evid. 702(c), (d).

15        The court highlights that its exclusion of Mr. Martin's testimony as to the standard

16   of care does not necessarily preclude this case from proceeding to trial. "[A] legal claim

17   is governed by the substantive law of the state in which the federal court sits, [so] the

18   federal court must look to state law with respect to the issue of whether expert witness

19   testimony is required to substantiate a claim that an individual deviated from the standard

20   of care applicable to his conduct." *Looman v. Mont.*, No. CV 11-143-M-DWM-JCL,

21   2013 WL 587344, at *1 n.1 (D. Mont. Jan. 31, 2013) (citing *Hutchinson v. United States*,

22   838 F.2d 390, 392 (9th Cir. 1988)). Under Washington law, a professional duty of care

ORDER- 48

1   must be established by expert testimony because the standards of a particular professional

2   community are generally outside of a layperson's experience.  *See Morton v. McFall*, 115

3   P.3d 1023, 1027 (Wash. Ct. App. 2005).  However, "[e]xpert testimony is unnecessary

4   where the acts in question are within the common knowledge or experience of lay

5   persons."  *Nedeau v. Armstrong*, No. CV-09-0189-EFS, 2011 WL 849744, at *4 (E.D.

6   Wash. Mar. 8, 2011).  In *Nedeau*, for example, the court determined that expert testimony

7   was not required in a case involving "a recreational bicycle tour organization" because

8   the court was "unable to find . . . any authority [under Washington law] applying the

9   professional negligence standard outside the context of investment advising, health care,

10  law, engineering, real estate, accounting, insurance, and the like."  *Id.*  Defendants have

11  not argued that the standard of care governing janitorial services at STIA is not within a

12  lay person's knowledge, and the court has not located any authority to the contrary.

13       In sum, the court concludes that Mr. Martin may testify as an expert as to the

14  nature of the floors at STIA when they become wet, but excludes Mr. Martin's testimony

15  about the Defendants' policies and practices for detecting and cleaning up spills.  In

16  addition, Mr. Martin may not testify as to his legal conclusions or otherwise instruct the

17  jury on the law applicable in this case.  *See Hangarter*, 373 F.3d at 1016.

18       3.  Plaintiffs' Motion to Exclude Alan Black's Testimony

19        Defendants offer Mr. Black as an expert on engineering and human factors.

20  (*See generally* Pls.' MTE Resp. (Dkt. # 56).)  Mr. Black offers six opinions, the first two

21  //

22  //

1  of which Plaintiffs do not contest.[23]  (Pls.' MTE at 7.)  However, Plaintiffs seek to

2  exclude Mr. Black's testimony on four opinions that relate to Defendants' policies and

3  procedures, the shoes Ms. Sudre wore at the time of her fall, and the psychological

4  phenomenon of inattentional blindness.  (*Id.*)  Mr. Black is a professional engineer and

5  has over 30 years of engineering and safety experience.  (Black Rep. at 47.)  He has a

6  Bachelor of Science degree in Mechanical Engineering from San Jose State University

7  and a Master of Science in Operations Research from Stanford University.  (*Id.*)  Mr.

8  Black has also taken a continuing education course in Principles of Behavioral

9  Neuroscience, Psychological Statistics, Abnormal Psychology, and Developmental

10  Psychology at UCLA.  (*Id.* at 48.)  Mr. Black has "extensive experience with theme park

11  development and attractions safety programs including risk analysis and hazard

12  mitigation."  (*Id.* at 75.)

13         *a.  Improper Supplementation of Mr. Black's Report*

14        Defendants acknowledge in their response that Mr. Black supplemented his expert

15  report in July 2016 and disclosed the supplemental report to Plaintiffs on July 18, 2016,

16  well after the court's case scheduling order directed the parties to disclose their expert

17  witnesses and opinions on May 11, 2016.  (Pls.' MTE Resp. at 10; *see also* Sched. Order

18

---

19  [23] Mr. Black's first two opinions are: (1) "[t]o a reasonable degree of engineering certainty, the material used in the construction of the floor is commonly used for the type of facility in

20  question and is reasonably slip resistant for the application," and (2) "[t]o a reasonable degree of engineering and human factors certainty, it is more probably true than not true that the [Port] did

21  not allow the flooring material to deteriorate so as to cause [Ms.] Sudre's accident."  (Black Rep. at 9-10.)  Because Plaintiffs do not challenge these opinions, the court makes no determination at

22  this time as to whether these opinions are relevant and reliable as *Daubert* requires and will take up the issue at the pretrial conference on January 4, 2017.  (*See* Sched. Order at 2.)

1   at 1.)  Defendants contend that Mr. Black supplemented his report after the deadline

2   because on May 13, 2016, Defendants received Mr. Sudre's deposition transcript, which

3   depicted "a distinctly different version of events than either [Ms.] Sudre or Mr. Lisk and

4   Mr. Aguilar as to where [Ms.] Sudre fell at STIA."  (Pls.' MTE Resp. at 10.)  Defendants

5   also state that they received interrogatory responses regarding Ms. Sudre's shoes on May

6   13, 2016.  (*Id.*)  Defendants request that the court find Mr. Black's July 2016

7   supplementation justified and harmless.  (*See id.* at 11.)

8          An expert must supplement his report "if the party learns that in some material

9   respect the disclosure is incomplete or incorrect, and if the additional or corrective

10  information has not otherwise been made known to the other parties during the discovery

11  process or in writing."  Fed. R. Civ. P. 26(a)(2)(3), (e)(1)(A).  "The supplementation

12  requirement of Rule 26(e)(1) is not intended, however, to permit parties to add new

13  opinions to an expert report based on evidence that was available to them at the time the

14  initial expert report was due."  *Obesity Research Inst., LLC v. Fiber Research Int'l, LLC*,

15  Case No. 15-cv-0595-BAS-MDD, 2016 WL 3167327, at *1 (S.D. Cal. June 7, 2016)

16  (internal quotation marks omitted).  "[A] supplemental expert report that states additional

17  opinions or seeks to strengthen or deepen opinions expressed in the original expert report

18  is beyond the scope of proper supplementation and subject to exclusion under [Federal

19  Rule of Civil Procedure] 37(c)."  *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1062 (C.D.

20  Cal. 2010).  "The party who fails [to comply with the supplementation requirements]

21  bears the burden of showing substantial justification for such failure or that its failure to

22  //

1   disclose was harmless." *Obesity Research*, 2016 WL 3167327, at *2 (internal quotations

2   omitted).

3         The court concludes that Mr. Black's supplemental report was not improper.  Mr.

4   Black updated his opinions to take into account Mr. Sudre's testimony about how and

5   where Ms. Sudre fell, which he could not have done prior to the May 11, 2016, expert

6   disclosure deadline.  (Sched. Order at 1.)  Mr. Black's updated opinions based on Mr.

7   Sudre's testimony, therefore, appear to be within Rule 26's requirement that an expert

8   supplement his report "if the party learns that in some material respect the disclosure is

9   incomplete or incorrect" based on information the expert did not previously have.  Fed.

10  R. Civ. P. 26(a)(2)(3), (e)(1)(A).  In addition, Mr. Black had already opined in his initial

11  report that Ms. Sudre's shoes had contributed to her fall, and Mr. Black updated his

12  report after conducting additional site testing based on Plaintiffs' interrogatory responses.

13        However, even if Mr. Black improperly supplemented his opinions, the

14  supplementation was harmless.  Defendants made Mr. Black's updated report available to

15  Plaintiffs before Mr. Black's deposition, and Plaintiffs provided the report to Mr. Martin

16  for critique.  (*See* Pls.' MTE Resp. at 12.)  For these reasons, the court finds that,

17  if Mr. Black's supplementation were improper, it was nevertheless harmless because

18  Plaintiffs had ample opportunity to test Mr. Black's updated opinions.

19        *b.  Policies and Procedures*

20        Mr. Black intends to testify that (1) "[t]o a reasonable degree of engineering and

21  human factors certainty, the [Port] and ABM procedures and time periods established for

22  the inspection of Concourse A were reasonable for inspection of such public areas for slip

1   and fall hazards," and (2) "[i]f it is assumed that [Ms.] Sudre fell in one or the other of

2   the two locations indicated by her and her husband as the location of the fall, and

3   assuming there was a contaminant involved in her fall, it is more probably true than not

4   true that ABM personnel had not yet detected the existence of such a contaminant within

5   the inspection time period established by ABM for detecting such potential slip and fall

6   hazards on Concourse A and thus, did not have reasonable notice thereof nor an

7   opportunity to remove the contaminant."  (Black Rep. at 10-12.)  Plaintiffs argue that Mr.

8   Black's opinions as to Defendants' policies and procedures do not reasonably rely on the

9   facts and data in this case (Pls.' MTE at 4-5, 7-9) and are unreliable because he "fails to

10  identify any scientific or technical bases for his opinions" (*id.* at 9).

11          In its gatekeeper role, the court first takes up the issue of whether Mr. Black's

12  opinions as to Defendants' policies and procedures are reliable.  Mr. Black's report notes

13  that his basis for the first opinion is that "[i]n addition to the cleanup response to tenant

14  reported spills, ABM has a policy to discover and remove any unreported

15  contamination," which consists of three ABM attendants patrolling the concourse each

16  hour.  (Black Rep. at 10.)  Mr. Black's second opinion on this topic relies on this same

17  basis, along with further explanation of Defendants' policies and practices as Mr. Perkins

18  described in his deposition.  (*See* Black Rep. at 11-12.)  Despite reaching these opinions,

19  Mr. Black's report provides no explanation of why Defendants' policies are acceptable

20  based on his experience, his knowledge, or industry standard.  (*See generally* Black Rep.)

21  Instead, Mr. Black simply states what the policies are and then reaches his conclusions.

22  Mr. Black's bare recitations of Defendants' policies, however, are insufficient to establish

1 │ that his opinions are reliable.  "If admissibility could be established merely by the *ipse*

2 │ *dixit* [*i.e.*, the "say so"] of an admittedly qualified expert, the reliability prong would be,

3 │ for all practical purposes, subsumed by the qualification prong."  *United States v.*

4 │ *Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (en banc).

5 │         In his deposition, Mr. Black stated that he based these opinions on his knowledge

6 │ of a grocery store's need to respond to a spill every 15, 20, or 25 minutes" (Black Dep.

7 │ 33:1-7) and on his 18 years "designing and building theme parks worldwide" (*id.* at

8 │ 33:16-17).  Mr. Black stated that these two experiences are "probably it" in forming the

9 │ basis of his knowledge and experience for these opinions.  (*Id.* at 34:4-7.)  Defendants do

10 │ not explain why Mr. Black's experience with and knowledge of grocery store and theme

11 │ park procedures qualifies him to testify as to the procedures employed at an airport.  (*See*

12 │ Pls.' MTE Resp. at 4-7.)  In addition, as to Mr. Black's opinion that "ABM personnel had

13 │ not yet detected the existence of such a contaminant within the inspection time period

14 │ established by ABM for detecting such potential slip and fall hazards on Concourse A

15 │ and thus, did not have reasonable notice thereof nor an opportunity to remove the

16 │ contaminant," Mr. Black does not explain why the procedures that ABM employed meant

17 │ that a contaminant would not have been discovered before Ms. Sudre's fall.  (*See* Black

18 │ Rep. at 11-12.)  Instead, Defendants rely on unsupported inferences.  (*See id.*)  For these

19 │ reasons, Defendants have not shown that Mr. Black's testimony is reliable, and

20 │ //

21 │ //

22 │ //

ORDER- 54

1   accordingly, the court excludes Mr. Black's opinions as to Defendants' practices and

2   policies.[24]

3        *c.  Ms. Sudre's Shoes*

4        Plaintiffs further argue that Mr. Black's opinion that Ms. Sudre's high heel shoes

5   contributed to her slip and fall is unhelpful to the jury because it is "pure, basic

6   commonsense," that addresses a matter within a layperson's common knowledge.  (Pls.'

7   MTE at 5-6 (citing Black Dep. 44:19-45:19).)  Defendants argue that "Mr. Black's

8   testimony regarding Mrs. Sudre's heel height is more than common sense, because it

9   quantifies the effect of heel height on the utilized coefficient of friction and increased the

10  likelihood she would slip."  (Pls.' MTE Resp. at 7-8.)

11       However, although Plaintiffs do not contest Mr. Black's opinion on this ground,

12  the court finds that Defendants have provided insufficient evidence to establish that Mr.

13  Black's opinion is based on a reliable methodology and reliably applied to the facts of

14  this case.  Mr. Black explained in his report that he tested the slip resistance of the floor

15  in the three possible fall locations using an English XL Variable Incidence Tribometer (in

16  much the same manner as Mr. Martin), and compared the heel height of Ms. Sudre's shoe

17  to findings in a single study, which states that heel height can significantly impact the

18  coefficient of friction.  (*Id.* at 14-15.)  Although Mr. Black is a professional engineer (*id.*

19  at 21), Mr. Black cannot rely on his credentials alone to testify as an expert on this topic,

20

21       [24] Because the court excludes as unreliable Mr. Black's opinions on Defendants' policies
22  and procedures, the court does not address Plaintiffs' other arguments for excluding this
    testimony.

1    *see Frazier*, 387 F.3d at 1261.  Mr. Black does not discuss whether the study he cites is

2    generally accepted in the field, whether it was subjected to peer review, or the potential

3    error rate of introducing heel height into an assessment of the coefficient of friction.  (*See*

4    *generally id.*)  Neither Mr. Black nor Defendants cite any federal case in which this kind

5    of testimony was admissible, and the court has not located any such case.  (*See generally*

6    *id.*; Pls.' MTE.)  Accordingly, the court cannot conclude that Mr. Black's methodology is

7    reliable and has been reliably applied to the facts of this case to form this opinion.  For

8    this reason, the court excludes Mr. Black's opinion as to Ms. Sudre's shoes.

9          d.   *"Inattentional Blindness"*

10    Finally, Plaintiffs argue that Mr. Black's testimony about inattentional blindness is

11    unreliable and that Mr. Black does not qualify as an expert to testify about this subject.

12    (Pls.' MTE at 10-12.)  Defendants counter that "[t]he bases for Mr. Black's opinion are

13    the Plaintiffs' testimony, Mr. Lisk's testimony, Mr. Aguilar's testimony, and Mr. Black's

14    education and experience regarding inattentional blindness, and several studies involving

15    inattentional blindness."  (Pls.' MTE Resp. at 8.)

16    Mr. Black states that Ms. Sudre demonstrated inattentional blindness when she

17    "[n]otic[ed] and underst[ood] the meaning of the safety cone, according to [her own]

18    testimony, yet fail[ed]to notice the presence of two men and a comparatively large

19    janitorial cart."  (Black Rep. at 20.)  Defendants state that "[i]nattentional blindness is

20    part of human factors or psychology, involving what characteristics of human behavior

21    are being elicited to cause an accident."  (Pls.' MTE Resp. at 9.)  In his report, Mr. Black

22    relies on only one citation—a website for the Noba Project—as a basis for his

1    understanding of inattentional blindness.  (Black Rep. at 20 n.14.)  The qualifications Mr.

2    Black outlines in his report indicate that he took a continuing education course in

3    "Principles of Behavioral Neuroscience, Psychological Statistics, Abnormal Psychology,

4    and Development Psychology" (*id.* at 22), which Defendants argue qualifies him to

5    "describe how the human brain processes information and determines what information

6    to pay attention [to]" (Pls.' MTE Resp. at 9).

7            In his deposition, Mr. Black referenced two studies regarding this psychological

8    phenomenon, which Mr. Black then provided to Plaintiffs in a supplemental expert

9    witness disclosure.  (*See id.* at 9; Black Dep. at 69:20-74:13; Markette Decl. in Opp. to

10   Pls.' MTE (Dkt. # 57) ¶¶ 3-4.)  Defendants invite the court to "see the three additional

11   articles accompanying" their response to further probe "the existence of" inattentional

12   blindness.  (Pls.' MTE Resp. at 10.)  The court first notes that it does not appear that Mr.

13   Black actually relied on these studies in forming his opinion because he does not list or

14   discuss them in his expert report.  (*See generally* Black Rep.)  In any event, although the

15   studies appear to be peer reviewed and may even describe a generally accepted principle

16   in the field of psychology, Defendants have failed to demonstrate that Mr. Black has the

17   requisite qualifications to give an opinion based on inattentional blindness.  Mr. Black's

18   foremost experience is as a professional engineer with degrees in Mechanical

19   Engineering and Operations Research.  (Black Rep. at 21.)  Although he has attended a

20   continuing education course in psychology, he does not state how taking this one course

21   qualifies him as an expert in this area or what area of psychology he specifically studied.

22   (*See* Black Rep. at 21-28; Capp Decl. ISO Pls.' MTE at 84 (providing the supplemental

1  background Mr. Black provided to Plaintiffs to demonstrate Mr. Black's qualification as

2  an expert on this topic).)  The other experiences he cites include designing attractions at

3  theme parks, training pilots, taking theater and drama courses in high school, and

4  working at a telephone crisis intervention center in high school (Capp Decl. ISO Pls.'

5  MTE at 84), none of which the court finds qualify him to testify as an expert about

6  inattentional blindness, *see, e.g.*, *Davies v. City of Lakewood*, No. 14-cv-01285-RBJ,

7  2016 WL 614434, at *10-11 (D. Colo. Feb. 16, 2016) (finding that former law

8  enforcement officers were unqualified to opine on inattentional blindness).  Accordingly,

9  the court finds that Defendants have not met their burden on demonstrating that Mr.

10  Black's opinion on inattentional blindness is admissible.

11        Based on the foregoing analysis, the court excludes Mr. Black's testimony on

12  inattentional blindness because Defendants have failed to meet their burden of

13  demonstrating that the testimony is admissible under Federal Rule of Evidence 702.  *See*

14  Fed. R. Evid. 702.

15  **E.**    **Motion for Sanctions**

16        1.  Legal Standard

17        Spoliation occurs when a party "destroys or alters material evidence or fails to

18  preserve" evidence when the party is under a duty to preserve it.  *Apple Inc. v. Samsung*

19  *Elec. Co., Ltd.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).  A party has a duty to

20  preserve evidence "when litigation is pending or reasonably anticipated."  *Moore v.*

21  *Lowe's Home Ctrs., LLC*, No. C14-1459RJB, 2016 WL 3458353, at *3 (W.D. Wash.

22  June 24, 2016).  "[T]rial courts in [the Ninth] Circuit generally agree that, '[a]s soon as a

1   potential claim is identified, a litigant is under a duty to preserve evidence which it knows

2   or reasonably should know is relevant to the action.'" *Apple*, 888 F. Supp. 2d at 991.

3   "Circuit courts describe the duty to preserve evidence as attaching when a party should

4   know that evidence may be relevant to litigation that is anticipated, or reasonably

5   foreseeable." *PacifiCorp v. Nw. Pipeline GP*, 879 F. Supp. 2d 1171, 1188 (D. Or. 2012)

6   (internal quotation marks omitted).

7       If a party had a duty to preserve evidence and did not, "the court considers the

8   prejudice suffered by the non-spoliator and the level of culpability of the spoliator,

9   including the spoliator's motive or degree of fault." *Moore*, 2016 WL 3458353, *3.  "A

10  party's destruction of evidence qualifies as willful spoliation if the party has 'some notice

11  that the documents were *potentially* relevant to the litigation before they were

12  destroyed.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006) (quoting *United*

13  *States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).  "There are two

14  sources of authority under which a district court can sanction a party who has despoiled

15  evidence:  the inherent power of federal courts to levy sanctions in response to abusive

16  litigation practices, and the availability of sanctions under [Federal Rule of Civil

17  Procedure] 37 against a party who fails to obey an order to provide or permit discovery."

18  *Id.* at 958.

19      2.  Plaintiffs' Motion

20      Plaintiffs argue that Defendants willfully destroyed video surveillance evidence

21  that documented Ms. Sudre's slip and fall at STIA.  (MFS at 1.)  Plaintiffs contend that

22  "[a]round November 8, 2014" Defendants were "on notice to preserve any video footage

ORDER- 59

1    of the incident." (*Id.* at 6 (citing Capp Decl. ISO MFS (Dkt. # 37) ¶ 4); *see also id.* ¶ 5

2    (attaching email from Mr. Capp on November 11, 2014, requesting that Defendants

3    preserve any video of Ms. Sudre's fall).) Plaintiffs also argue that Defendants were on

4    notice of litigation immediately following Ms. Sudre's fall because they investigated her

5    fall, prepared a "general liability report," and took pictures of the shoes she was wearing.

6    (MFS Reply at 1, 4.) Plaintiffs contend that the Port's Paul Pelton, the airport duty

7    manager, testified that "[t]he primary purpose of the investigation is not to promote safety

8    but to document what happens and for risk management purposes." (MFS at 4 (citing

9    Pelton Dep. (Dkt. # 42) at 9:1-10:18).) Plaintiffs further argue that Defendants never

10   attempted to locate the video because "they believed that the case was so clear-cut." (*Id.*

11   at 6.)

12         Mr. Pelton investigated the accident. (MFS Resp. (Dkt. # 58) at 2 (citing Pelton

13   Dep. at 7:7-9, 12:17-19).) On the day Ms. Sudre fell, Mr. Pelton did not look to see if

14   video of the fall had been captured because he thought that Ms. Sudre had "walked

15   through the area where Mr. Lisk and Mr. Aguilar were standing and fell near the cone."

16   (*Id.* (citing Pelton Dep. at 224-23:18, 27:20-28:3, 28:17-22).) Defendants contend that

17   they "could not have reasonably anticipated litigation when their investigations revealed

18    [Ms.] Sudre walked into a wet area, which was covered by a cone, and the ABM

19   attendant had followed proper cleaning and barricading procedures." (*Id.* at 6.)

20         Dave Richardson, Defendants' Federal Rule of Civil Procedure 30(b)(6) designee,

21   testified that, although possible, it was unlikely that the surveillance cameras at STIA

22   would have recorded the area where Ms. Sudre fell. (*See id.* at 3 (citing Richardson Dep.

ORDER- 60

1    (Dkt. # 44) at 15:6-10, 23:21-24:3).)  Mr. Richardson also testified that the Port retains

2    surveillance footage for between three and 30 days, and that any footage taken near

3    where Ms. Sudre fell would have been retained for 30 days.  (*Id.* at 24:13-25:25,

4    26:7-28:2.)  The day after receiving Mr. Capp's November 11, 2014, email, Mr.

5    Richardson looked for video, but determined that if any had existed, it had been

6    destroyed according to normal business procedures within 30 days after the incident.

7    (Northcraft Decl. in Opp. to MFS at 1 (attaching email from Mr. Richardson indicating

8    he had looked for the video).)  Accordingly, Defendants argue that they did not spoil

9    evidence because "the video footage was destroyed prior to the Defendants having notice

10   of the possibility of litigation, and the video footage was overwritten—destroyed—in

11   compliance with the video retention policy at STIA."[25]  (MFS Resp. at 5.)  Because

12   Defendants had a policy that called for retaining the video surveillance for the area where

13   Ms. Sudre for only 30 days, Defendants state that "[a]ny video would have been

14   overwritten on or around October 22, 2014."  (*Id.*)

15   //

16

_____

17       [25] Defendants further state that Plaintiffs spoiled evidence because they left Ms. Sudre's
     "shoes at the Rehabilitation Center, where she stayed from October 2014 to January 2015, and
18   the Center threw them away."  (MFS Resp. at 9 (citing Northcraft Decl. in Opp. to MFS at 9).)
     Defendants state that Mr. Capp first reached out to Defendants in November 2014, so at the time
19   that Ms. Sudre's shoes were thrown away, "Plaintiffs already knew the slip and fall may lead to
     litigation."  (*Id.*)  As a result of the shoes being thrown away, Defendants contend that they
20   "were deprived the possibility of evaluating the structural integrity of the shoes and determining
     whether [their] wear and tear affected Mrs. Sudre's tendency to slip."  (*Id.*)  Accordingly,
21   Defendants argue that they are entitled to a negative inference similar to their expert Alan
     Black's opinion that Ms. Sudre's shoes caused or contributed to her fall.  (*Id.*)  The court
22   concludes that this issue has not been fully briefed and accordingly denies the request without
     prejudice to re-raising the issue in an appropriate filing.

ORDER- 61

1    The court agrees that Defendants did not willfully spoil evidence.  Defendants

2    were first on notice of potential litigation when Mr. Capp emailed them on November 11,

3    2014.  (*See* Capp Decl. ISO MFS, Ex. A); *Perez v. U.S. Postal Serv.*, No. C12-0315RSM,

4    2014 WL 10726125, at *3 (W.D. Wash. July 30, 2014) ("Letters threatening or providing

5    notice of potential litigation can trigger the duty to preserve.").  Although Defendants

6    investigated Ms. Sudre's fall immediately after it occurred and documented that

7    investigation, the court concludes that those actions alone are insufficient to demonstrate

8    that Defendants anticipated litigation on September 22, 2014, the day of Ms. Sudre's fall.

9    *See Kitsap Physicians Serv.*, 314 F.3d at 1001 (holding that no duty to preserve arose

10   from an internal investigation that resulted in "an opinion from outside legal counsel that

11   there were no bases for fraud"); *Putscher v. Smith's Food & Drug Ctrs., Inc.*, No.

12   2:13-CV-1509-GMN-VCF, 2014 WL 2835315, at *7 (D. Nev. June 20, 2014) (finding

13   that "[s]tock language [about the report being prepared in anticipation of litigation and

14   under the direction of legal counsel] on the bottom of a preprinted incident report" did

15   not alone trigger a duty to preserve in a slip and fall case); *but see Stedeford v. Wal-Mart*

16   *Stores, Inc.*, No. 2:14-cv-01429-JAD-PAL, 2016 WL 3462132, at *9 (D. Nev. June 24,

17   2016) (finding sanctions were warranted because a customer's report of her injury from a

18   slip and fall in the store for which she intended to seek medical attention made litigation

19   reasonably foreseeable).  Despite Plaintiffs' characterizations, the Port conducted its

20   investigation of Ms. Sudre's fall for several reasons, including to promote safety, to

21   document what happened, and for risk management purposes.  (Pelton Dep. at

22   *//*

ORDER- 62

1  9:14-10:18.)  Therefore, the investigation itself did not trigger a duty to preserve

2  evidence.

3       In addition, "[w]here a party has a long-standing policy of destruction of

4  documents on a regular schedule," like Mr. Richardson testifies the Port does,

5  "destruction that occurs in line with the policy is relatively unlikely to be seen as

6  spoliation."  *Micron Tech., Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (9th Cir. 2011).

7  Plaintiffs are simply incorrect in stating that Defendants never attempted to locate video

8  until the spring of 2016, and that Defendants' failure to look for the video is evidence of

9  willful or bad-faith destruction of evidence.  (*See* Northcraft Decl. in Opp. to MFS ¶ 1, p.

10  2 (attaching Richardson email).)  Emails that Defendants produced to Plaintiffs in

11  discovery show that Mr. Richardson looked for the video on November 12, 2014, one day

12  after Plaintiffs' counsel made the request.  (*Id.*)  For these reasons, Defendants did not

13  have a duty to preserve evidence until Mr. Capp's November 11, 2014, letter informed

14  Defendants that litigation was reasonably foreseeable, and the court denies Plaintiffs'

15  motion.

16              **IV.    CONCLUSION**

17       For the foregoing reasons, the court DENIES Defendants' motion for summary

18  judgment (Dkt. # 31), GRANTS Defendants' motion for relief from the court's case

19  scheduling order and for leave to amend their answers subject to Defendants filing their

20  proposed amendments on the docket no later than Friday, December 9, 2016, at 12:00

21  p.m. and the court's approval of those proposed amendments (Dkt. # 46), GRANTS in

22  part and DENIES in part Defendants' motion to exclude William Martin's testimony

1   (Dkt. # 33), GRANTS Plaintiffs' motion to exclude parts of Alan Black's testimony (Dkt.

2   # 35), and DENIES Plaintiffs' motion for sanctions for spoliation of evidence (Dkt. # 36).

3       Dated this 2nd day of December, 2016.

4

5

6       _____

7       JAMES L. ROBART
        United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 64